UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
STEVEN J. PHILLIPS and MARIE CONDOLUCI,
individually and as parents and natural guardians
of T.C.P., an infant,                                                    10 CIV 00239 (KMK)

                              Plaintiffs,                                ECF CASE

       - against -                                                       **THIRD AMENDED**
                                                                         **COMPLAINT**
COUNTY OF ORANGE,
BOARD OF EDUCATION GOSHEN                                                 **PLAINTIFFS DEMAND**
CENTRAL SCHOOL DISTRICT,                                                  **TRIAL BY JURY**
VILLAGE OF GOSHEN,
ANDREW SCOLZA, in his individual and
official capacity, JAMIE SCALI-DECKER,
in her individual and official capacity, and
MARY KAY JANKOWSKI, in her
individual and official capacity,

                              Defendants.
-------------------------------------------------------------X

       Plaintiffs STEVEN J. PHILLIPS, MARIE CONDOLUCI and T.C.P. ("plaintiffs") by

their attorney Marie Condoluci, PLLC, allege for their Third Amended Complaint against the

COUNTY OF ORANGE, BOARD OF EDUCATION GOSHEN CENTRAL SCHOOL

DISTRICT, VILLAGE OF GOSHEN, ANDREW SCOLZA, JAMIE SCALI-DECKER and

MARY KAY JANKOWSKI, the following:

## NATURE OF THE ACTION

1.  This is an action brought pursuant to 42 U.S.C. § 1983, for the deprivation, under color of

    state law, of the rights privileges and immunities secured by federal statues and the

    United States Constitution.

**PARTIES**

2.  Plaintiff STEVEN J. PHILLIPS ("Phillips") is an individual residing in the County of Orange, State of New York and is the natural father and guardian of infant plaintiff T.C.P.

3.  Plaintiff MARIE CONDOLUCI ("Condoluci") is an individual residing in the County of Orange, State of New York and is the natural mother and guardian of infant plaintiff T.C.P.

4.  Plaintiff T.C.P. ("T.C.P.") is an individual residing in the County of Orange, State of New York and is the natural daughter of Condoluci and Phillips and resides with them.

5.  At all relevant times, T.C.P. was a five year old child and kindergarten student at Scotchtown Avenue Elementary School, located in the Goshen Central School District in the County of Orange, State of New York.

6.  Condoluci and Phillips are currently and were at all relevant times married and also the parents of another younger daughter, R.S.C.P., that resides with them.  T.C.P. and R.S.C.P. are full natural sisters.

7.  Defendant COUNTY OF ORANGE (the "County") is a domestic municipal corporation duly organized and existing under and by virtue of the laws of the State of New York, capable of suing and being sued.  The County is a state actor for purposes of 42 U.S.C. § 1983.

8.  Defendant BOARD OF EDUCATION GOSHEN CENTRAL SCHOOL DISTRICT (the "School District") is the governing body of Goshen Central School District, a Central School District duly organized and existing under the laws of the State of New York,

County of Orange, capable of suing and being sued.  The School District is a state actor for purposes of 42 U.S.C. § 1983.

9. Defendant VILLAGE OF GOSHEN (the "Village") is a domestic municipal corporation duly organized and existing under and by virtue of the laws of the State of New York, capable of suing and being sued.  The Village is a state actor for purposes of 42 U.S.C. § 1983.

10. Defendant ANDREW SCOLZA ("Scolza") is an individual employed at all relevant times by the Village as a Police Officer.  At all relevant times, Scolza was a state actor for purposes of 42 U.S.C. § 1983.

11. Defendant JAMIE SCALI-DECKER ("Decker") is an individual employed at all relevant times by the County as a senior caseworker in the Department of Social Services.  At all relevant times, Decker was a state actor for purposes of 42 U.S.C. § 1983.

12. Defendant MARY KAY JANKOWSKI ("Jankowski") is an individual employed at all relevant times by the School District as a social worker.  At all relevant times, Jankowski was a state actor for purposes of 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1343(a)(3), and 1343(a)(4).

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district.

## STATUTORY AND REGULATORY BACKGROUND

**I.       The Reporting Statutes and Regulations**

15. N.Y. Social Services Law § 422(1) establishes a statewide central register of child abuse and maltreatment reports (the "SCR") capable of receiving telephone calls alleging child abuse and maltreatment.

16. N.Y. Social Services Law § 422(2) provides for a statewide hotline number available to the general public and a "special unlisted express telephone number" for use only by persons mandated by law to make reports.

17. N.Y. Social Services Law § 422(2)(b) requires that a telephone call made by a mandated reporter containing allegations which if true would constitute child abuse or maltreatment "shall constitute a report" and shall be immediately transmitted orally or electronically to the appropriate local child protective service for investigation.

18. N.Y. Social Services Law § 413 defines who is a mandated reporter.  It requires persons employed in certain professions to call the SCR when "they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child, or when they have reasonable cause to suspect that a child is an abused or maltreated child where the parent, guardian custodian or other person legally responsible for such child comes before them in their professional or official capacity and states from personal knowledge facts, conditions or circumstances which, if correct, would render the child abused or maltreated."

19. N.Y. Social Services Law § 413 further requires all mandated reporters to include in any report they make the name, title, and contact information for every staff person believed to have direct knowledge of the allegations.

II.     **The Investigation Statutes and Regulations**

20. N.Y. Social Services Law § 423(6) allows a social services district to establish multidisciplinary investigative teams for the purpose of investigating reports of suspected child abuse or maltreatment.

21. N.Y. Social Services Law § 423(6) provides that members of multidisciplinary teams shall include, among others, representatives from child protective services, law enforcement and the district attorney's office.

22. N.Y. Social Services Law § 423(6) requires that members of the multidisciplinary team "conduct investigative functions consistent with the missions of the particular agency member involved."

23. N.Y. Social Services Law § 423(6) provides that all members of a multidisciplinary investigative team, "consistent with their respective agency missions" facilitate the appropriate disposition of cases through the criminal justice system in a collaborative manners.  It allows all members of the team to share with other members information concerning the child or the child's family.

24.  N.Y. Social Services Law § 423(6) requires each multidisciplinary team to develop a written protocol for investigation of child abuse and maltreatment cases and for interviewing child abuse and maltreatment victims.

25. N.Y. Family Court Act § 1034 provides that child protective services may seek, and a family court judge may order, a parent to produce a child at a particular location or to a

particular person for an interview and observation "where there is reasonable cause to suspect that a child or children's life or health may be in danger..."[1]

26. In determining if such orders shall be made, the court is required to consider all relevant information including the source's ability to observe that which has been alleged and "any other relevant information that the investigation has already obtained."

27. N.Y. Family Court Act § 1034(e) directs the court to assess which actions are necessary in light of the child or children's safety, provided, however, *__that such actions shall be the least intrusive to the family.__*

28. N.Y. Family Court Act § 1034 further provides that the court shall be available at all hours to hear such requests by the social services district and that the requests may be made either in writing or orally.

### III.   __The Criminal Statute__

29. N.Y. Social Services Law § 422(14) provides that "[t]he department shall refer suspected cases of falsely reporting child abuse … to the appropriate law enforcement agency or district attorney."

30. N.Y. Penal Law Section 240.50 (4) provides that a person is guilty of falsely reporting an incident in the third degree when, knowing the information reported, conveyed or circulated to be false or baseless, he: [r]eports by word or action, an alleged occurrence or condition of child abuse or maltreatment which did not in fact occur or exist to: (a) the SCR; or (b) a mandated reporter knowing that the person is required to report such cases.

---

[1] Plaintiffs do not concede the constitutionality of this statute as it provides for the seizure of a child on a showing of less than probable cause.  It was enacted in 2006 in the wake of the Nixzmary Brown tragedy and over the constitutional objections of numerous children's legal advocacy groups.  The statute, however, was New York law when the investigation took place.

**FACTUAL ALLEGATIONS**

31. Plaintiffs Condoluci and Phillips love and care for their two daughters T.C.P. and R.S.C.P. and have never allowed, nor would they ever allow, anyone to inflict any physical or emotional injury upon them.

32. Condoluci is an attorney, admitted to practice law in the State of New York in 1995.  She is acting as her own as well as her husband's and daughter's attorney in this action.  She is a former law clerk to two district judges in the Southern District of New York, a former Assistant County Attorney for the defendant County in the municipal law department and a former cadet in the United States Air Force Academy.

33.  Phillips holds a masters degree in psychology and is a licensed mental health counselor in the State of New York.

**I.      PRE-INVESTIGATION FACTS**

  **A.  Falletta's Statements to Plaintiffs**

34. On or about October 1, 2009 Condoluci and Phillips had what they mistakenly believed to be a friendship with Thresa Falletta ("Falletta"), who had one daughter six months younger than T.C.P.

35. Falletta's daughter and T.C.P. were friends.

36. On or about October 15, 2009, Falletta became aware that Phillips, who is Jewish, would be performing a wedding ceremony as a minister of the Universal Life Church.

37. Falletta informed Phillips that she was "offended" as a Christian that he, being Jewish, would be performing a wedding ceremony as a minister.

38. On or about October 30, 2009, Falletta was in Condoluci and Phillips' home.

39. While there, Falletta saw pictures of T.C.P. in a mermaid costume hanging on the plaintiffs' refrigerator.

40. The mermaid costume consisted of a bikini top and full length custom made mermaid tail.

41. All of T.C.P.'s private parts were covered in the photos and T.C.P. was smiling and happy in all.

42. Falletta asked Condoluci where she purchased it and how much the costume cost.

43. Condoluci asked Falletta if Falletta and her daughter would be interested in joining Condoluci, Phillips and their daughters on a weekend trip to an indoor pool so that T.C.P. could use the mermaid costume.

44. Falletta responded, "only if you buy [my daughter] a mermaid costume too."

### B.  Falletta's Conversations with Hogle

45. On or about November 2, 2009 Falletta worked part-time as an office manager for the Hopewell Presbyterian Church (the "Church") in Thompson Ridge, New York.

46. Falletta was also a member of the Church.

47. The Church also ran a preschool on weekday mornings during the school year which provided the Church with the SCR's special unlisted telephone number for mandated reporters.

48. Neither Condoluci , Phillips, nor T.C.P. were ever members of the Church nor did T.C.P. ever attend the preschool.

49. The Church's pastor, and Falletta's co-worker, was Robin J. Hogle ("Hogle").

50. On or about November 2, 2009 Falletta told Hogle about Phillips performing a marriage ceremony as a minister and how Falletta was offended "as a Christian" by this because Phillips was Jewish.

51. Falletta also told Hogle at that time that plaintiffs Condoluci and Phillips had inappropriate, provocative photos of T.C.P. on their refrigerator - speaking of the photos of T.C.P. in a mermaid costume - and that Phillips had described the photos as "art."

52. For unknown reasons, Hogle *grossly* misinterpreted Falletta's statements to mean that plaintiffs had "nude" photos of T.C.P. on their refrigerator.

53. Falletta also told Hogle that T.C.P. went to the school nurse a lot for no reason, that Phillips spoke about T.C.P.'s body inappropriately and that Phillips slept with T.C.P. while Condoluci slept with R.S.C.P.

54. Based on the above facts, Falletta went on to tell Hogle that she had "concerns" that T.C.P. was being sexually abused by Phillips and that Condoluci was aware of the abuse and doing nothing.

55. Hogle had received training from the Hudson River Presbytery that all suspicions of child abuse were to be reported to the SCR.

56. Hogle received no training, however, on what reasonable cause to suspect abuse was, if she was ever mandated to report, when a person was mandated to report under state law, or what number to call.

## C.  Hogle's Call to the SCR

57. On November 3, 2009 at 8:46 a.m. Hogle called the SCR.

58. Hogle called the special unlisted express telephone number for use only by mandated reporters.

59. Neither T.C.P., Phillips nor Condoluci ever came before Hogle in her professional or official capacity and stated from their personal knowledge, facts, conditions or circumstances that would render T.C.P. an abused or maltreated child.

60. Hogle was not a "mandated reporter" despite her use of the special unlisted number.

61. Hogle communicated to the SCR that she had "information" she was not sure what to do with.

62. Hogle told the SCR that "close friends" of the plaintiffs had come to her and told her that the plaintiffs have "nude pictures" of T.C.P. on their refrigerator which they explained as "art", that Phillips spoke inappropriately about T.C.P.'s body and that Phillips slept with T.C.P.

63. Hogle also stated that the "close friends" told her T.C.P. goes to the school nurse a lot for no reason and that the "close friends" had "ongoing concerns" of sexual abuse for "about 3 months."

64. Hogle went on to state to the SCR that these "close friends" had witnessed specifics and confronted the family and that the "close friends" may have more details that Hogle could not divulge.

65. Hogle told the SCR that none of the "information" she was relaying was of her own personal knowledge but information brought to her by the "close friends."

66. Hogle refused to provide Falletta's name to the SCR as the "close friends" that was the source of the "concerns" as would have been required of a mandated reporter.

67. The SCR initially told Hogle that they did not believe there was sufficient information to take a report.

68. Hogle's statements to the SCR were nothing more than her hearsay account of some anonymous person's concerns and did not amount to reasonable cause to suspect that Phillips was sexually abusing T.C.P., that Condoluci was an inadequate guardian or that T.C.P. was abused in any way, sexually or otherwise.

69. At 8:46 a.m. on November 3, 2009 a report was nonetheless taken by the SCR with allegations that Phillips was suspected of sexually abusing T.C.P. and that Condoluci was an inadequate guardian because she was aware of the abuse and doing nothing.

70. Upon information and belief, the report was taken without reasonable cause to suspect T.C.P. was abused because N.Y. Social Services Law § 422(2)(b) *requires* reports to be taken from *mandated reporters* under certain circumstances and the SCR mistakenly believed Hogle was a mandated reporter merely because she used the special unlisted number.

71. Neither Hogle nor the anonymous "close friends" had ever been proven to be reliable sources of information.

72. In accordance with N.Y. Social Services Law § 422(2)(b), the report was immediately transferred to the County child protective services.

II.    **INVESTIGATION FACTS**

     A.  **Initial Contact with Hogle**

73. November 3, 2009, the day the SCR report was transmitted to the County, was Election Day and T.C.P.'s school as well as County offices, including the child protective services, were officially closed.

74. At 9:25 a.m. on November 3, 2009, County caseworker Susan Hughes ("Hughes") was the after hour's caseworker on call and received a telephone call from the 911 Communications Center who informed Hughes to call the SCR.

75. At 9:29 a.m. Hughes called the SCR and spoke to Sarah Tessitore regarding the report.

76. At 9:49 a.m., Hughes called Hogle.

77. Hogle told Hughes that the children were not in imminent danger.

78. Hughes told Hogle that CPS would follow up on the report.

79. At 9:52 a.m. Hughes called her supervisor Karen Smith ("Smith") and informed her of the report and of Hughes' contact with Hogle.

80. Smith told Hughes that CPS would follow up on the report the following day since Hughes was able to make contact with Hogle.

81. On November 3, 2009, either Smith or Hughes could have sought an order from the Family Court pursuant to Family Court Act § 1034 to interview T.C.P.

82. Upon information and belief, Smith forewent this option because T.C.P. was not in imminent danger and Smith knew the following day T.C.P.'s school would be open and the interview could be conducted without the need for a court order.

83. No further action was taken on the report on November 3, 2009.

**B.  The Initial Case Conference**

84. The following day, November 4, 2009, the report was assigned to Decker.

85. Decker and her supervisor Smith had a case conference regarding the new report.

86. At that conference, before Decker had performed any investigation whatsoever, it was determined that Scolza would also be assigned to the case as the law enforcement member of the multidisciplinary team established by the County pursuant to N.Y. Social

Services Law § 423(6) and that Decker and Scolza would interview T.C.P. at school that day.

87. Decker and Smith mistakenly believed the report was made by a mandated reporter pursuant to N.Y. Social Services Law § 413.

88. At the initial case conference, neither Smith nor Decker discussed or even contemplated contacting either Phillips or Condoluci.

89. Neither Smith nor Decker discussed or even contemplated attempting to corroborate *any* of the statements made by Falletta to Hogle before interviewing T.C.P.

90. Neither Smith nor Decker discussed or even contemplated obtaining parental consent of either parent before conducting the interview.

91. Neither Smith nor Decker discussed nor even contemplated obtaining a court order pursuant to Family Court Act § 1034 before conducting the interview.

92. Neither Smith nor Decker discussed or even contemplated whether the report contained reasonable cause to suspect that T.C.P. was sexually abused by Phillips or that Condoluci was an inadequate guardian.

### C.  Decker calls Hogle

93. After the initial case conference, Decker performed a criminal search of Phillips and Condoluci to determine whether either had any criminal or abuse history.

94. None was found.

95. Decker next called Hogle.

96. Hogle told Decker that a close friend of the family had approached her stating that they had "concerns" about the family for "years" – as opposed to the "3 months" Hogle had reported to the SCR.

97. Decker did not ask Hogle about the discrepancy.

98. Hogle refused to provide Falletta's name to Decker as would have been required if Hogle had in fact been a mandated reporter.

99. Hogle reiterated that Falletta had told her (Hogle) that she (Falletta) had "confronted the family with her concerns" and that the Phillips had denied all of the allegations.

100.    No such confrontation between Falletta, Phillips or the family ever took place.

101.    Hogle told Decker that she was unaware of T.C.P. acting out in any way and that T.C.P. had been in a week long bible school with the Church over the summer.

102.    The only time T.C.P. ever came before Hogle in her professional or official capacity was at a weeklong bible camp at which time Hogle observed no statements or behavior of T.C.P. to raise any suspicion that she was abused.

103.    This was Hogle's only statement made to Decker from personal knowledge.

104.    Hogle also told Decker that the close friend had stated T.C.P. frequently goes to the school nurse for unknown reasons.

105.    Decker confirmed with Hogle that the report taken by the SCR was accurate *to what Hogle was told by Falletta*.

106.    Hogle went on to tell Decker that Falletta had additional information that only she would know.

107.    Because Hogle refused to provide Falletta's name or contact information to Decker, Decker urged Hogle to have Falletta call her.

108.    Decker told Hogle that she (Decker) could not address concern if she was not aware of it.

109.    Hogle agreed to forward Decker's name and number to Falletta.

### D.  **The Call to the School**

110.     Immediately following her discussion with Hogle, Decker called Scotchtown Avenue Elementary School and spoke to Mrs. Clark, the school's vice principal.

111.     Decker was informed by Mrs. Clark that T.C.P. was in kindergarten at the school and was present in school that day.

112.     ***This was the only information Decker sought***.

113.     Decker did not ask whether anyone at the school who had daily personal contact with T.C.P. had any concerns for her.

114.     Decker did not ask whether T.C.P. went to the school nurse frequently as claimed by Falletta.

115.     The statement by Falletta that T.C.P. went to the school nurse often for unknown reasons was an opportunity for Decker to corroborate Falletta's statement.

116.     Decker could have done this with absolutely no added burden and without alerting the parents to the report.

117.     Decker ignored this opportunity focusing the investigation solely on interviewing the child.

### E.  **Scolza joins the Investigation**

118.     Decker and Scolza had a case conference with supervisor Smith and all agreed that T.C.P. would be interviewed in school regarding the allegations.

119.     At no point in time, did Decker, Smith or Scolza discuss or even contemplate whether the report contained reasonable cause to suspect that T.C.P. had been abused at the hands of her parents before conducting the interview.

120.    At no point in time, did Decker, Smith or Scolza discuss or even contemplate obtaining either parent's consent before conducting the interview.

121.    At no point in time did Decker, Smith or Scolza discuss or even contemplate obtaining a court order pursuant to Family Court Act § 1034 before conducting the interview.

122.    At no point in time did Decker, Smith or Scolza ever discuss or even contemplate waiting for Falletta to call before interviewing T.C.P.

123.    At no point in time did Decker, Smith or Scolza discuss or even contemplate asking the school nurse whether T.C.P. actually did go to the school nurse frequently for unknown reasons.

124.    At no point in time did Decker, Smith or Scolza discuss or even contemplate asking any school personnel whether they had any concerns for T.C.P.

125.    No contemplation of investigation other than interviewing T.C.P. was made because ***it was protocol to always interview the child first – without consent or a court order involving all reports concerning sexual abuse*** – regardless of whether such report created reasonable cause to suspect a child had been abused.

126.    Upon information and belief, this protocol was established so that the County and Village could interview the child before the parents were even aware that a report had been made – regulations require that the parents be given written notice of the report within seven days.

F. **The In School Interview**

127.     On November 4, 2009 at approximately 11:49 a.m. – 27 hours after Hogle's call

to the SCR – Scolza and Decker arrived at T.C.P.'s school, Scotchtown Avenue

Elementary School and showed their identification to school personnel.

128.     They asked no questions of anyone concerning T.C.P. – not the school nurse or

her teacher or the school social worker.

129.     They simply waited for T.C.P. to be brought to them in the Assistant Principal's

office to conduct the interview.

130.     Merely upon Scolza and Decker showing their identification to school authorities,

Jankowski, the school social worker, went to T.C.P.'s kindergarten class to remove her

for questioning.

131.     Neither Jankowski, nor any school employee, had any cause to believe that T.C.P.

was abused in any way.

132.     When she went to remove her, Jankowski gestured toward T.C.P.'s teacher to find

out if she had any reason to believe T.C.P. was abused.

133.     T.C.P.'s teacher nodded her head aggressively in the negative.

134.     Upon information and belief, Jankowski did not relay this information to Scolza

or Decker.

135.     T.C.P. was then removed from her kindergarten class by Jankowski and escorted

to the office of the Assistant Principal where Scolza and Decker were waiting to question

her.

136.     Jankowski knew or should have known that the questioning by Scolza and Decker

would involve intimate matters of T.C.P.'s family and home life.

17

137.     The School District did not inquire of Scolza or Decker whether parental consent and/ or notification had ever been made or attempted before removing T.C.P. from her kindergarten class and allowing her to be questioned.

138.     The School District did not inquire of Scolza or Decker whether they had either reasonable or probable cause to suspect that T.C.P. was an abused child and that her parents were the perpetrators.

139.     The School District did not inform Scolza and Decker that T.C.P. had shown absolutely no signs of abuse and that they had no concerns for her whatsoever.

140.     It was School District policy only to check IDs and to have an employee present before allowing an interview of intimate home matters to be conducted without parental consent, without a court order, without exigent circumstances and without either reasonable or probable cause to believe a child was abused.

141.     It was and remains the custom and policy of the School District to allow County caseworkers and Village police officers to interview all enrolled children, regardless of age, in school without parental consent, without a court order, without a showing of any emergency circumstances and without regard to whether reasonable or probable cause exists to suspect that the child is abused and that the parents are the abusers.

142.     When brought to the Assistant Principal's Office for questioning, Jankowski told T.C.P. that she "had to" answer the questions of Scolza and Decker who were strangers to her.

143.     The door to the office was closed with Scolza, Decker, Jankowski and T.C.P. present.

144.     Decker told T.C.P. that the interview was "like a test."

145.     At no time did Jankowski, Decker or Scolza offer to T.C.P. to call either of her parents.

146.     At no time did Jankowski, Decker or Scolza tell T.C.P. that she was free to leave the room whenever she wanted.

147.     T.C.P. was so young she was not even permitted to travel the halls of the school alone – even the kindergarten bathroom was located inside the classroom.

148.     T.C.P. could not have reasonably believed that she was free to leave the Assistant Principal's office.

149.     No five year old child would reasonably believe that he/she was free to leave the Assistant Principal's office.

150.     On November 4, 2009 from approximately 11:49 a.m. through 12:30 p.m. – 41 minutes - T.C.P was questioned by Decker and Scolza in Jankowski's presence.

151.     The first thing Decker noticed was that T.C.P. appeared clean and appropriately dressed.

152.     Decker and Scolza introduced themselves to T.C.P. and explained where they worked.

153.     T.C.P. accurately stated her name and address and stated that she resided with Phillips, Condoluci and her sister, R.S.C.P.

154.     What ensued was an in-depth, no holds barred probe into every personal aspect of Phillips', Condoluci's and T.C.P.'s intimate home life for purely investigatory purposes.

155.     Decker and Scolza asked T.C.P. whether Phillips and Condoluci fight at home; which parent bathed her and how; where she and her parents slept; whether her parents

ever spanked her; whether she has ever been alone, whether she had her own room; what

types of magazines, T.V. and movies she watched with her parents.

156.     Most of these matters were not raised as concerns by Hogle's report nor did most

of them even constitute "abuse" under any New York statute.

157.     Scolza and Decker asked T.C.P. about her private parts, and whether anyone had

touched her "down there" with a corresponding motion to her private parts.

158.     Decker and Scolza saved for the ***end of the questioning*** whether there were any

nude pictures of her in the home.

159.     T.C.P. responded "no".

160.     The questions asked by Decker and Scolza were not the "least intrusive to the

family" as would have been required in an order issued under Family Court Act § 1034.

161.     T.C.P. gave positive answers to all the questions posed:  she denied that anyone

had touched her and made her feel uncomfortable; she denied ever being alone; she

denied domestic violence or physical punishment in her home; she denied that anyone

was in her home without clothing on; she denied seeing any magazines, movies or TV

with people that have no clothes on; she identified children's websites that she goes to;

she denied that there were any pictures of anyone in her home without clothing on; she

denied ever seeing anyone else's private parts or being asked to show hers and told

Decker and Scolza that she would talk to her mom, dad or tell the police if anyone ever

asked; she denied the police ever being at her house; she denied being afraid of anyone

and agreed that she is safe in her home; she denied having any secrets that she was afraid

to tell anyone.

162.    When conducting interviews of a child during the course of an investigation, it is County and Village protocol to use a set script of questions, regardless of the nature of the allegations made and regardless of whether the answers from the child dispelled the suspicion of abuse.

163.    Regardless of the nature of the allegations made in a report, ***all*** matters of home life are probed in these child interviews by the County and Village - not just those areas necessary to dispel suspicions.

164.    The questions asked of all interviewed children involve the most intimate of home matters concerning the child and the parents' home life.

165.    ***After the interview was concluded***, Scolza and Decker spoke to Jankowski who verified with the school nurse that there were no concerns for T.C.P.

166.    The school nurse also informed Decker and Scolza that T.C.P ***did not*** come to her office a lot for unknown reasons.

167.    Jankowski asked if Decker and Scolza were going to notify T.C.P.'s parents of the questioning since she was "bound to talk about it."  They responded yes.

168.    Neither Phillips nor Condoluci would have consented to two strangers – one of them male – interviewing T.C.P. about their home life or her "private parts" in school without them present.

### G.  The Plaintiffs are Notified

169.    After the interview, at approximately 2:15 p.m. Decker went to the plaintiffs' residence at which time nobody was home.

170.    Decker left her card wedged in the front door of the home with a handwritten note on the back to contact her.

171.     At approximately 2:42 Decker called the plaintiffs' home but no one was home.

172.     At approximately 3:00 p.m. Phillips arrived home, entering through the garage.

173.     It was purely by chance that Phillips opened the front door and found Decker's card.

174.     Phillips immediately called but was unable to reach her.

175.     Phillips then called Condoluci and asked if she was aware of anything that had happened to T.C.P. at school that day to which she responded "no."

176.     Phillips and Condoluci immediately began frantically calling Decker believing that T.C.P. had been molested while at school that day.

177.     They were unable to reach her for over an hour during which time they believed their daughter had been seriously harmed.

178.     At approximately 4:00 p.m. Phillips finally reached Decker.

179.     It was that point in time – more than 31 hours after Hogle's call to the SCR and more than four hours after their daughter had been questioned – that Phillips and Condoluci first became aware that a report against them had been made to the SCR and that their five year old daughter  - only in kindergarten for two months - had been questioned in school that day.

180.     Phillips asked what allegations had been made.

181.     Decker refused to reveal the nature of the allegations made in the report because it was protocol to have law enforcement present when those allegations were revealed.

182.     Decker only told Phillips that there were allegations of "inappropriate pictures" on their refrigerator.

183.     Decker told Phillips that she and "her partner" would "have to" see his other 2 year old daughter, R.S.C.P. and interview him and Condoluci.

184.     It was protocol in all investigations of reports involving sexual abuse to interview the parents and observe their other children, regardless of whether the report created reasonable cause to suspect abuse and regardless of whether the investigation to that point had dispelled the suspicion of abuse.

185.     There were absolutely no allegations of "concerns" that R.S.C.P. was abused.

186.     Phillips asked if he could come in that afternoon but Decker said no because "her partner" was unavailable.

187.     Decker never informed Phillips that her "partner" was a Village police officer.

188.     Phillips agreed to come in the following morning at 9:00 a.m. with R.S.C.P.

189.     Given that they had just found out that Decker and Scolza had interviewed T.C.P. without their knowledge or consent, Condoluci and Phillips feared that if they did not consent to the interview and observation of R.S.C.P., Decker and/or Scolza would return to T.C.P.'s school to question or remove her or attempt to seize R.S.C.P. from her preschool.

190.     Condoluci and Phillips consented to the interview and observation in order to protect their children from the trauma of further seizures at the hands of Scolza and Decker.

### H.  **The Interview of Condoluci and Phillips and Falletta's Call to Decker**

191.     The next day, November 5, 2009, Phillips, Condoluci and R.S.C.P went to the County's Department of Social Services office in Goshen where Decker was located.

192.     They were placed in a waiting room.

193.     While Condoluci, Phillips and R.S.C.P. were waiting, Decker received a call from Falletta.

194.     Falletta refused to provide her name to Decker.

195.     At that point in time, Decker knew Falletta to be an unreliable source of information since two of the statements she had made to Hogle – about the photos and the school nurse – were false.

196.     Falletta stated that she was the close friend of the family and the source of the information given to Hogle.

197.     Falletta stated that her daughter was best friends with T.C.P. and that she had met Condoluci and Phillips with other parents due to having children the same age.

198.     Falletta told Decker that she was very nervous about speaking to her due to concern that she would have an issue with Phillips and Condoluci and that there was information not said in the report that only she knew about.

199.     Falletta stated that she was afraid of confrontation with the family, contrary to her earlier statements to Hogle that she had confronted Phillips with her concerns of abuse.

200.     Falletta's first "cause" for "concern as told to Decker was that T.C.P. "is very smart."

201.     Falletta informed Decker that she had no knowledge of T.C.P. acting out sexually and denied that T.C.P. had ever disclosed any inappropriate actions by her father.

202.     Falletta told Decker that T.C.P. slept ***every other night*** with Phillips and that the parents took turns sleeping in the guest room with 2 year old R.S.C.P., contrary to her earlier statements to Hogle that Phillips slept with T.C.P. and Condoluci slept with R.S.C.P.

203.        Falletta told Decker that Phillips made comments about people thinking he is a

sexual predator and that he put this "out there" as a joke.

204.        No such comments were ever made.

205.        Falletta next told Decker that she had specifically "followed" Phillips while he

was transporting T.C.P. and Falletta's daughter from ice skating lessons and that when he

passed a nude bar he put his blinker on "as if he were going to turn in."

206.        Falletta failed to tell Decker that Falletta and Phillips had left the ice skating

lessons at the same time with the understanding they would meet up at a local

McDonald's, i.e. Phillips knew Falletta was "following" him.

207.        Falletta's daughter chose to ride in Phillips' car and Phillips, knowing Falletta

was directly behind him, put his blinker on as a joke.

208.        Phillips never actually pulled in to a nude bar nor did Falletta ever state that he

did.

209.        Falletta next told Decker about yet a different anonymous person who got a "sick

feeling" from Phillips and that this other anonymous person would not leave his child

alone with Phillips.

210.        No facts to support this anonymous person's "sick feeling" were ever relayed by

Falletta to Decker nor did Decker ever ask for any.[2]

211.        Falletta did not bring up the "nude pictures" reported by Hogle so Decker asked

her to discuss them.

---

[2] After the commencement of this action, the anonymous person with the "sick feeling" ran into
Phillips at a local area, walked up to him and shook Phillips' hand asking him how he was doing.

212.     Falletta told Decker that there were pictures of T.C.P. in a mermaid tail hanging on the refrigerator and the costume looked as if it came from "Frederick's of Hollywood."

213.     Falletta told Decker that Condoluci had approached her and asked if she felt Phillips was inappropriate and that Falletta should have addressed her "concerns" then but did not because she did not want to upset Condoluci.

214.     Condoluci never asked Falletta if she felt Phillips was inappropriate.

215.     Decker did not ask Falletta to explain any of the discrepancies between the statements made to her and those made to Hogle.

216.     Rather, Decker told Falletta that she understood the concern and urged Falletta to discuss her concerns with the family.

217.     Falletta told Decker that Condoluci had called her the day before very upset that T.C.P. had been questioned at school and that Condoluci felt someone was lying.

218.     Falletta told Decker that she was specifically asked by Condoluci if she made the call to the SCR and that Falletta denied it.

219.     Falletta failed to tell Decker that Condoluci also specifically asked if Falletta had made any statements to anyone that could have caused the call to the SCR.

220.     Falletta denied this to Condoluci also.

221.     After she concluded her phone call with Falletta, Decker came to the waiting room where Phillips, Condoluci and their 2 year old had been waiting.

222.     Decker entered the room and asked Phillips to accompany her alone stating that it was protocol to interview the parents separately.

223.     Decker and Scolza knew that Condoluci was an attorney.

224.     Phillips was brought to an interview room alone with Decker and Scolza present and the door closed.

225.     Neither Decker nor Scolza informed Phillips that Scolza was a Village police officer.

226.     Scolza explained the allegations and read the report narrative to Phillips who was extremely upset by the allegations.

227.     He vehemently denied any abuse of either of his children.

228.     Phillips expressed his and Condoluci's concern that Decker and Scolza had questioned T.C.P. without informing or getting their consent.

229.     Phillips denied that any friends had concerns for his children or suspected him of abuse.

230.     Scolza and Decker asked Phillips if he and his wife fought, used drugs or alcohol.

231.     Phillips answered no stating that he is a substance abuse counselor.

232.     Phillips told Decker and Scolza that everything he does is for his children.

233.     Phillips was asked about the photos of T.C.P. in a mermaid suit.

234.     Phillips told them the photos were not provocative in any way and that Condoluci had brought them with her.

235.     Phillips denied ever inappropriately touching his children and was extremely upset with those allegations.

236.     Phillips stated that while he does use foul language with other parents, it is never directed at his children and he denied referring to his children in a sexual way.

237.     After this, Decker brought Condoluci and R.S.C.P. into the room with Scolza and Phillips.

238.     At no point in time did Decker or Scolza identify Scolza as a Village police officer.

239.     The first thing Scolza and Decker asked when Condoluci and R.S.C.P. were brought into the room was whether anybody "had it in for them."

240.     Condoluci expressed her displeasure with the CPS process and that T.C.P. was interviewed at school without her or Phillips' consent.

241.     Condoluci was asked and vehemently denied that either of her children were neglected or physically abused in any way and denied any "inappropriate language" or sexual acts in her home.

242.     Condoluci complained to Decker and Scolza that they had conducted the interview without ever gauging the credibility of the reporter or the reporter's source.

243.     In response, Decker stated that "we do it all the time" and that it was "protocol" to not contact parents or obtain consent before going to a school to interview a child.

244.     Scolza informed Condoluci that if parents were contacted first, they would have an opportunity to coach the child and make the investigations more difficult.

245.     Scolza further stated that innocent parents should not be concerned when their children are questioned by strangers about their private parts without their consent because "they have nothing to hide."

246.     Decker asked to see the pictures of T.C.P. in the mermaid costume.

247.     Condoluci produced to Decker all the pictures of T.C.P. in the costume.

248.     The first thing Decker said when she saw the pictures was "where did you get that?" Condoluci told Decker the name of the website where the costume could be purchased.

249.     Decker noted that all of T.C.P.'s private areas were covered and that T.C.P. was happy in all of them.

250.     Decker specifically noted that the pictures did not appear provocative or inappropriate in any way.

251.     Condoluci explained that the tail was form fitting because it was *a mermaid costume* custom made to fit T.C.P., that it cost $200.00, and that Condoluci had purchased it for T.C.P. simply because she wanted it.

252.     Decker asked whether the children slept with Condoluci and Phillips.

253.     Before Condoluci could answer, Decker stated "who doesn't" and that sleeping with your children "doesn't mean anything."

254.     Condoluci answered yes that Condoluci and Phillips both slept with their children.

255.     Scolza and Decker observed Condoluci and Phillips two year old child the entire time of the interview.

256.     At the conclusion of the interview, Decker stated that she was now "required to" conduct a home inspection.

257.     It was protocol in all investigations of reports involving sexual abuse to conduct a home inspection, regardless of whether the report created reasonable cause to suspect abuse and regardless of whether the investigation to that point had dispelled any suspicion of abuse.

258.     Scolza handed Condoluci his business card with the County seal on it identifying him as an "Investigator" for the Orange County Department of Social Services.

259.     Neither Scolza nor Decker ever identified Scolza as a Village police officer at any point during the investigation or after.

260.     At approximately 11:45 a.m. on November 5, 2009, the interview of Phillips and Condoluci was concluded and the plaintiffs' scheduled their "required" home inspection to be conducted the following day, November 6 at 2:00 p.m.

261.     Condoluci and Phillips feared that if they did not consent to the home inspection, Decker and/or Scolza would return to T.C.P.'s school to question or remove her or attempt to seize R.S.C.P. from her preschool or that Decker and Scolza would seek to remove the children from the home.

262.     Condoluci and Phillips consented to the interview and observation in an attempt to protect their children from the trauma of further seizures at the hands of Scolza and Decker.

### I.   The Meeting with School Officials

263.     Immediately following their meeting with Decker and Scolza, Phillips and Condoluci went to T.C.P.'s school, Scotchtown Avenue Elementary School.

264.     At approximately 12:30 p.m. on November 5, 2009 Phillips and Condoluci met with Melissa Lawson, the vice-principal, and Jankowski.

265.     When Condoluci and Phillips complained that the school had allowed the questioning without their knowledge or consent, Lawson responded that its school policy to let CPS decide whether parents are notified or not.

266.     Lawson stated that all the school does is check ID's and make sure a school employee is present during the questioning.

267.     Lawson further stated that a letter could be placed in T.C.P.'s file that T.C.P. was not to be spoken to by anyone other than school personnel without the parent's prior written permission.

268.     The very next day, November 6, 2009, Condoluci sent a letter to Daria Murphy,

the principal of Scotchtown Avenue Elementary School stating that T.C.P. was not to be

spoken to by anyone other than school personnel without the prior written consent of a

parent.

269.     On November 6, 2009, at approximately 11:00 a.m. Daria Murphy called

Condoluci to acknowledge receipt of the letter.

270.     Murphy told Condoluci that the school would comply with her request.

### J.   The "Required" Home Visit

271.     At approximately 2:30 p.m. on November 6, 2009, CPS worker Joe LaSusa, a

senior caseworker, arrived at plaintiff's home to conduct the home inspection.

272.     Phillips and R.S.C.P. were present upon his arrival and Condoluci arrived shortly

thereafter.

273.     LaSusa walked around the downstairs of the home looking around and observed

Phillips and Condoluci interacting with their 2 year old.

274.     Downstairs contained the living room, play room, home office and kitchen only.

275.     LaSusa sat at the plaintiffs' kitchen table after walking around the downstairs.

276.     While LaSusa refused to give either Condoluci or Phillips Hogle's name, LaSusa

told Condoluci and Phillips that the report had come from a "mandated reporter."

277.     Condoluci asked what questions had been posed to her daughter during the

interview since T.C.P. was too young for Condoluci to ask herself.

278.     LaSusa refused to divulge the questions stating only that T.C.P. gave good

answers to the questions and that there was a "whole series of questions" which the

caseworkers routinely ask where none of the abuse is ever mentioned.

279.     LaSusa laughed about the answers given by children in response to questions about their bath routine.

280.     Phillips informed LaSusa that he had had a discussion with "friends" where he discussed people's differing views of art and how Anne Geddes' naked pictures of babies are considered as art to many.

281.     LaSusa told Phillips that he should be careful about what he said to people because there were many "small-minded" people in Orange County.

282.     LaSusa stated it was CPS policy to question children in school without obtaining parental consent and that the nature of the allegations "didn't matter."

283.     After sitting and talking for approximately 20 minutes, LaSusa then told Condoluci and Phillips that "with allegations like these, I need to see the bedrooms."

284.     At that point in time, the only "allegations" LaSusa had were pictures of T.C.P. in a mermaid costume that his own co-workers had seen and determined to be harmless and anonymous statements of "concerns" from a person whose veracity had been disproven.

285.     Condoluci and Phillips again feared that their children would suffer either by seizure or removal if they did not comply.

286.     LaSusa was brought upstairs and shown all the bedrooms in the home.

287.     LaSusa questioned why the daughters were not sleeping in their own bedrooms by themselves.

288.     Condoluci explained to LaSusa that they had discussed that issue at length with their pediatrician who told Condoluci and Phillips that it was an individual decision for each family to make and that in countries such as China, it is considered child abuse to have the child sleep alone.

289.     Condoluci explained that the family's sleeping arrangements worked for them.

290.     LaSusa came back downstairs.

291.     Condoluci informed him that a note had been placed with T.C.P.'s school that

T.C.P. was not to be questioned at school again.

292.     LaSusa stated that he would pass that information on to Decker.

293.     The home visit was concluded and LaSusa left.

294.     When he went back to the office LaSusa informed Decker that Condoluci and

Phillips had placed a note with the school that T.C.P. was only to communicate with

school personnel.

295.     In the case summary of the report Decker noted that "Parents have requested that

their child not be spoke to without notification after this report and have put notice on file

with the school to state such."

### K.  The Report is Deemed Unfounded

296.     On November 9, 2009, Decker and Smith held another case conference wherein it

was agreed that the case should be closed as "unfounded."

297.     Decker informed Scolza that the report would be closed as unfounded.

298.     On November 13, 2009 – ten days after Hogle's call to the SCR – the report was

deemed unfounded and administratively closed by the County.

299.     Hogle refused to allow her name to be released to Condoluci and Phillips as the

source of the report.

### L.  Defendants Realize Hogle's Not a Mandated Reporter

300.     On November 9, 2009, Condoluci hand delivered a letter to Decker and Smith

explaining the impact the investigation had on their family and requesting that the case be

referred to the District Attorney's Office for prosecution of the mandated reporter's source of information under N.Y. Penal Law § 240.50(4).

301.     That same day, Decker informed Condoluci to direct all questions concerning criminal matters to the district attorney's office and Scolza.

302.     In reviewing whether charges were appropriate against Hogle's anonymous source, the district attorney's office reviewed N.Y. Penal Law § 240.50(4) and the definition of a "mandated reporter" under N.Y. Social Services Law § 413.

303.     It was determined that charges could not be brought against Falletta because Hogle was not a "mandated reporter" as defined by Social Services Law §413 and required by the Penal Law.

304.     The district attorney informed Decker that charges could not be brought and why.

305.     This was the first time that Decker, Scolza, Smith and LaSusa became aware that Hogle was not a mandated reporter – after their investigation had been completed and deemed unfounded.

## III.     POST-INVESTIGATION FACTS

### A.  The Impact on the Family

306.     The questioning of T.C.P. and the ensuing investigation drove a wedge into the family that eroded the family's solidarity internally and impaired the family's ability to function as a unit.

307.     The impact of the questioning of T.C.P. and the ensuing investigation to the family was devastating.

308.     Because of T.C.P.'s young age, neither Phillips nor Condoluci were able to have

an open and frank dialogue about the questioning causing the parents to feel emotionally

distant from their own daughter.

**B. Damages**

309.     T.C.P. was visibly upset when she came home the day of the interview and told

her parents only that she had to answer some questions.

310.     From November 4, 2009 through December 3, 2009, Condoluci and Phillips were

unable to sleep regularly or eat.

311.     Condoluci often vomited after attempting to eat when she envisioned her five year

old daughter in the Assistant Prinicpal's Office being questioned about her private parts

by two strangers – one of them male.

312.     Condoluci and Phillips, having to keep the vestige of normalcy for the sake of

their daughters during the day, often burst into tears and cried for hours after the children

went to sleep.

313.     Phillips would only run local errands late in the evening when few people were

out because he felt as though people were looking at him as a pedophile.

314.     Condoluci became nauseous every time she walked into Scotchtown Avenue

Elementary School for T.C.P.'s school functions.

315.     As of the drafting of this complaint, Condoluci still becomes nauseous when

thinking of the questioning of her daughter and the totally unwarranted invasion of her

family's constitutional rights because ***none*** of the defendants knew what "reasonable

cause to suspect abuse" meant nor did they know the definition of a mandated reporter.

316.     Phillips and Condoluci removed T.C.P. from the School District and are sending her to private school to ensure her safety, well-being and to ensure the protection of their constitutional rights.

317.     Phillips and Condoluci will not be enrolling R.S.C.P. in the School District for the same reasons that T.C.P. was removed.

318.     For over six months, Phillips and Condoluci were inhibited in their interactions with their own children in fear of their affection being misunderstood by LaSusa's "small-minded" people.

**IV.    FACTS SPECIFIC TO CLAIMS**

      **A.   The Protocol for Investigations**

319.     All reports concerning sexual abuse received by the County, even those that do not create a reasonable cause to suspect abuse, are investigated by multidisciplinary teams.

320.     Pursuant to an intermunicipal agreement, the Village is contractually obligated to participate in such team investigations upon the County's request and according to the team protocol.

321.     Upon information and belief, the intermunicipal agreement is signed by the Village mayor – an individual that has supervisory and policy making authority over Village police officers pursuant to N.Y. Village Law § 4-400.

322.     On all reports with allegations of sexual abuse, the law enforcement member of the multidisciplinary team was assigned to conduct an investigation "consistent with the mission" of the agency of the particular member.

323.    Law enforcement members of the team, such as Scolza, were assigned to investigate in order to generate evidence for general law enforcement purposes.

324.    The protocol for investigations by the multidisciplinary teams is developed by the "team" – including law enforcement.

325.    In the case of the County and the Village, the protocol for investigations by the team includes, as the first step in all investigations, interviewing the child in school without parental consent, without a court order, without exigent circumstances and without reasonable or probable cause to suspect abuse at the hands of the parents.

326.    The protocol includes a set script of questions to be asked of every child involving intimate matters of their home life and their parents' home life.

327.    All questions in the script are asked regardless of whether the team's suspicion of abuse are dispelled early in the interview.

328.    All questions in the script are asked regardless of the nature of the allegations contained in the report.

329.    The protocol requires that allegations in the report not be revealed to parents unless law enforcement is present – even where there is no reasonable cause to suspect abuse.

330.    The protocol requires the interview of the suspected abusing parent alone with law enforcement present with or without reasonable or probable cause to suspect abuse when the interview takes place.

331.    The protocol requires that law enforcement identify themselves throughout the investigation process as a County employee – not as a police officer.

332.     The protocol requires an interview of the parents that are the subjects of the report concerning intimate home matters regardless of whether the report creates a reasonable suspicion of abuse or whether the investigation to that point had dispelled any previous suspicion.

333.     The protocol requires observation of other children in the parents' home regardless of whether the report creates a reasonable suspicion of abuse of the other children or whether the investigation to that point had dispelled any previous suspicion.

334.     The protocol requires a home visit, without the law enforcement member of the team, regardless of whether the report creates a reasonable suspicion of abuse or whether the investigation to that point had dispelled any previous suspicion.

335.     Law enforcement was pervasively involved with the development and application of the protocol.

336.     While the ultimate goal of the protocol may have been to ensure children were safe, the immediate and overriding objective was to gather evidence for general law enforcement purposes in order to reach that goal.

337.     The protocol for investigations by the multidisciplinary teams, as set forth above, is both known to and approved by County and Village supervisors and policymakers.

338.     The investigation that took place involving Phillips, Condoluci and T.C.P. was all in accordance with the team protocol.

   **B.  Qualified Immunity**

339.     A parent's liberty interest in the "care, custody and management" of their child had long been established as a fundamental constitutionally protected right at the time of the investigation.

340.     It was well-established by United States Supreme Court precedent at the time of the investigation that while the protection of children is a legitimate government interest, the state may not exercise its power in service of that interest without any "reasonable justification."

341.     Decker and Scolza knew or objectively should have known that *any* investigation without "reasonable justification" was unconstitutional.

342.     It was well established by Supreme Court precedent at the time of the investigation that anonymous tips alone, without corroboration, were insufficient to create reasonable suspicion.

343.     The "tip" that set the investigation into motion here was not only anonymous but also came by way of hearsay.

344.     It was not objectively reasonable for Decker or Scolza to believe that they had reasonable cause to suspect abuse of T.C.P. when commencing the investigation.

345.     At the time the investigation took place, defendants were aware that Family Court Act § 1034 required "reasonable cause to suspect" that a child's life or health may be in danger before it could order a child be produced for questioning.

346.     At the time the investigation took place, defendants had guidance from an Administrative Directive of The New York State Office of Children & Family Services that unequivocally stated that "parents … may refuse a CPS caseworker access to a named child and to the child's home."

347.     Decker and Scolza knew other school districts in New York State did not allow caseworkers – nonetheless police officers - into the school to question children without the written consent of the parents.

348.     Decker wrote in the report that the parents had put the school on notice that they refused permission for T.C.P. to be spoken to by anyone other than school personnel.

349.     Decker acknowledged to Condoluci that in any future investigation contact with T.C.P. would not be made without contacting the parents first.

350.     The principal of Scotchtown Avenue Elementary School acknowledged that it would not allow anyone other than school personnel to speak with T.C.P. as a result of Condoluci's letter.

351.     Defendants knew and acknowledged to Condoluci that she had the right to refuse defendants access to T.C.P. even when T.C.P. was at school.

352.     No written policy was provided to Condoluci and Phillips upon enrolling T.C.P. in the School District informing them that, without consent, their daughter would be subject to interviews by case workers and police officers about her intimate home life upon the mere showing of identification.

353.     It was not objectively reasonable for defendants to believe that Condoluci and Phillips had waived their constitutional right to refuse access to T.C.P. while she was at school.

354.     It was not necessary for Jankowski, Decker or Scolza to know the source of the parents' right to refuse access (i.e. Fourth or Fourteenth Amendment) in order for them to be on notice that such a right existed.

355.     It was not objectively reasonable for Scolza, Decker or Jankowski to believe that it was lawful to interview T.C.P. about intimate family matters without reasonable cause to suspect that T.C.P.'s health or life was in danger.

356.     No officer of reasonable competence would conclude that it was lawful to interview T.C.P. without reasonable cause to suspect abuse.

### C. **Failure to Train**

357.     The County and Village failed to train its employees as to what constitutes reasonable cause to suspect abuse.

358.     The County and Village failed to train its employees as to who is a "mandated reporter" as defined by New York State Law.

359.     Decker had a battery of lawyers employed by the County Family Law Department at her disposal to review the laws and facts to make legal determinations for her.

360.     Decker never received training to seek their assistance.

361.     Scolza had a battery of lawyers employed by the District Attorney's Office at his disposal to review the laws and facts to make legal determinations for him.

362.     Scolza never received training to seek their assistance.

363.     The failure to train amounted to a deliberate indifference to plaintiffs' constitutional rights.

364.     The County and Village knew to a moral certainty that its employees charged with investigating reports of abuse would confront situations that would require them to determine whether a report created reasonable cause to suspect abuse.

365.     The County and Village knew to a moral certainty that its employees charged with investigating reports of abuse would confront situations that would require them to determine whether a report had been made by a mandated reporter.

366.     Proper training in what constitutes reasonable cause to suspect abuse and who is a "mandated reporter" would make that determination less difficult for employees.

367.     A wrong determination of what constitutes reasonable cause to suspect abuse or

who is a "mandated reporter" by CPS workers and police officers will frequently cause

deprivation of constitutional rights by interfering with parents' and children's

constitutional rights without reasonable justification to do so.

**First Cause of Action**
**By T.C.P. Against All Defendants**
**Violation of Fourth Amendment Rights - Unreasonable Seizure**
**Based Upon The Interview of T.C.P.**

368.     Plaintiffs repeat, reallege and incorporate all the allegations made above as though

fully set forth herein.

369.     Parents have the right and authority to limit their child's physical freedom of

movement.

370.     Parents send their children to public school to receive an education.

371.     When parents place a child in public school, they delegate to *school personnel*

only that part of their authority to restrict the child's movement that is needed to *further*

*or is related to furthering the school's educational mission*.

372.     Once the restraint in school serves a purpose beyond or unrelated to the school's

educational mission, it exceeds the authority delegated by the parents and becomes a

seizure under the Fourth Amendment.

373.     The interview of T.C.P. was neither necessary nor related to the school's

educational mission.

374.     She was, in fact, removed from the educational environment in order that it could

be conducted.

375.     The interview of T.C.P. exceeded the authority delegated to school personnel by

the parents to restrict the movement of their child.

376.     Jankowski, Decker and Scolza were all present in the interview room and their

presence caused T.C.P. to believe that she was not free to leave.

377.     The interview of T.C.P. was a seizure by Jankowski, Decker and Scolza.

378.     Seizures are per se unreasonable without a warrant (court order), probable cause,

consent or exigent circumstances.

379.     None of these exceptions to the warrant requirement existed.

380.     The seizure was not justified at its inception because there was no reasonable

cause to suspect abuse at the time T.C.P. was seized.

381.     The seizure was not reasonably related in scope to the circumstances.

382.     There are no "special needs" present in child abuse investigations to excuse the

warrant and probable cause requirements.

383.     No "special needs" of the school existed either for the same reason that the

interview was a seizure – it did not further nor was it related to furthering the school's

educational mission.

384.     Even if "special needs" in the abuse investigation context did exist, they would be

inapplicable here because the investigation and interview served the immediate purpose

of gathering evidence for general law enforcement purposes.

**Second Cause of Action**
**By Phillips, Condoluci and T.C.P. Against All Defendants**
**Violation of Fourth Amendment Rights - Unreasonable Search**
**Based Upon The Interview of T.C.P.**

385.     Plaintiffs repeat, reallege and incorporate all the allegations made above as though

fully set forth herein.

386.     Parents and their children share a common zone of privacy in their home.

43

387.    Parents and children have a reasonable expectation of privacy concerning what takes place within their home.

388.    The reasonable expectation of privacy of a parent when they send their child to public school is that intimate matters of the child and parents' home life will not be discussed unless the child him or herself raises such matters with school personnel..

389.    Intimate matters of the child and parents' home life is not necessary to further the school's educational mission.

390.    While school personnel may be mandated to report when a child or parent *comes to them* and discusses intimate home life details that may constitute abuse, parents do not expect that with absolutely no concerns for abuse, the school will intentionally set out to try and obtain, or allow others to try and obtain, evidence of abuse by allowing an interview of their child with respect to intimate family matters.

391.    A five year old child does not have dominion or control over any portion of the home in which she lives.

392.    A five year old child lacks the requisite age, education or intelligence to voluntarily consent to a search of herself or her parents.

393.    The search was not justified at its inception because there was no reasonable cause to suspect abuse at the time the search took place.

394.    The search was not reasonably related in scope to the circumstances.

395.    The search was undertaken without a warrant (court order), without probable cause, without consent and without exigent circumstances.

396.    The interview of T.C.P. violated Condoluci, Phillips' and T.C.P.'s right to be free from unreasonable searches under the Fourth Amendment.

**Third Cause of Action**
**By Phillips, Condoluci, Against Village, County, Decker and Scolza**
**Violation of Fourth Amendment Rights - Unreasonable Search**
**Based Upon The Interview of Phillips and Condoluci**

397.      Plaintiffs repeat, reallege and incorporate all the allegations made above as though

fully set forth herein.

398.      The interview of Phillips and Condoluci sought details of their intimate home life

– matters in which Condoluci and Phillips had a reasonable expectation of privacy.

399.      The interview was a search under the Fourth Amendment that is per se

unreasonable without a warrant, probable cause, consent or exigent circumstances.

400.      The circumstances under which Phillips and Condoluci agreed to the interview

did not amount to voluntary consent of the search by Decker and Scolza:  Decker did not

inform Phillips or Condoluci that they could decline the interview; Decker did not reveal

that her partner who would also be conducting the interview was a Village police officer;

Decker refused to reveal the nature of the allegations against Condoluci and Phillips

unless they came to her office for the interview; and she told Phillips that she "had to"

see R.S.C.P.

401.      This was all stated by Decker in the very same conversation that Phillips learned

Decker and Scolza had interviewed T.C.P. at school that day without their knowledge.

402.      Condoluci and Phillips reasonably, and subjectively, believed that if they refused

the interview, Decker and Scolza would return to T.C.P.'s school to question and/or

remove her, or go to R.S.C.P.'s preschool to seize her.

403.      Condoluci and Phillips both knew that Decker (and they believed Scolza) could

seek an *ex parte* order of removal of T.C.P. and R.S.C.P. from their custody.

404.     Any fit parent would subject themselves to an invasion of their privacy interest to protect their child from *any* emotional trauma.

405.     Condoluci and Phillips agreed to the interview as a mere acquiescence to Decker and Scolza's colorable authority to investigate.

406.     The consent was not voluntary.

407.     The search was not justified at its inception because there was no cause - reasonable or otherwise - to suspect abuse at the time the interview of Condoluci and Phillips took place.

408.     The search was not reasonably related in scope to the circumstances.

409.     The interview of Condoluci and Phillips violated their right to be free from unreasonable searches under the Fourth Amendment.

**Fourth Cause of Action**
**By Phillips and Condoluci, Against County**
**Violation of Fourth Amendment Rights - Unreasonable Search**
**Based Upon The Home Visit**

410.     Plaintiffs repeat, reallege and incorporate all the allegations made above as though fully set forth herein.

411.     Physical searches of the home are presumptively unreasonable without a warrant issued upon probable cause, consent or exigent circumstances.

412.     The circumstances under which Phillips and Condoluci agreed to the home visit did not amount to voluntary consent of the search by LaSusa:  Decker did not inform Phillips or Condoluci that they could decline the home visit; Decker told them that the home visit was required; Condoluci and Phillips agreed to the home visit during the course of their interview which itself was unconstitutional.

413.     Condoluci and Phillips reasonably, and subjectively, believed that if they refused the home visit, Decker and Scolza would return to T.C.P.'s school to question and/or remove her, or go to R.S.C.P.'s preschool to remove her.

414.     Condoluci and Phillips both knew that Decker (and they believed Scolza) could seek an order of removal of T.C.P. and R.S.C.P. from their custody.

415.     Any fit parent would forego their and their child's privacy interest to protect the child from *any* emotional trauma.

416.     Condoluci and Phillips agreed to the home visit as a mere acquiescence to Decker and Scolza's colorable authority to investigate.

417.     The search was not justified at its inception because there was no cause – reasonable or otherwise - to suspect abuse at the time the home visit took place.

418.     The search was not reasonably related in scope to the circumstances.

419.     The consent was not voluntary.

420.     The home visit violated Condoluci and Phillips' right to be free from unreasonable searches under the Fourth Amendment.

**Fifth Cause of Action**
**By Phillips and Condoluci Against All Defendants**
**Violation of Fourteenth Amendment Rights – Procedural Due Process**
**Based Upon The Interview of T.C.P.**

421.     Plaintiffs repeat, reallege and incorporate all the allegations made above as though fully set forth herein.

422.     Before parents may be deprived of the care, custody or management of their children without their consent, due process – ordinarily a court proceeding resulting in an order must be accorded them.

423.     The right to care, custody and management includes the parents' right to teach their children not to speak to strangers or anyone else about their intimate home life and their private parts which right cannot be interfered with by the state without due process of law.

424.     The right to care, custody and management includes the parents' right to be present to offer comfort and consolation to their child when being questioned by strangers about intimate family matters which right cannot be interfered with by the state without due process of law.

425.     The interview of T.C.P. deprived Phillips and Condoluci of the care and management of T.C.P. without due process of law.

426.     No emergency or exigent circumstances existed to warrant depriving Phillips and Condoluci of the care and management of T.C.P. without a corresponding court proceeding or consent.

**Sixth Cause of Action**
**By Phillips, Condoluci and T.C.P. Against All Defendants**
**Violation of Fourteenth Amendment Rights – Substantive Due Process**
**Based Upon The Interview of T.C.P.**

427.     Plaintiffs repeat, reallege and incorporate all the allegations made above as though fully set forth herein.

428.     The integrity of the family unit is a constitutional right protected by the Fourteenth Amendment.

429.     Phillips, Condoluci and T.C.P. have a substantive right under the Fourteenth Amendment to remain together without the interference of the state.

430.     The interview of T.C.P. without reasonable cause to suspect abuse was an arbitrary exercise of the state's power without any reasonable justification.

431.     The interview of T.C.P. substantially impacted the family unit.

**Seventh Cause of Action**
**By Phillips and Condoluci Against County, Village, Scolza and Decker**
**Violation of Fourteenth Amendment Rights – Substantive Due Process**
**Based Upon The Interview of Condoluci and Phillips and Observation of R.S.C.P.**

432.     Plaintiffs repeat, reallege and incorporate all the allegations made above as though fully set forth herein.

433.     The interview of Condoluci and Phillips about intimate matters of their family home life and observation of R.S.C.P. without *any* cause to suspect abuse was an arbitrary exercise of the state's power without any reasonable justification.

434.     The interview of Condoluci and Phillips substantially impacted the family unit.

435.     The interview of Condoluci and Phillips and observation of R.S.C.P. without any cause to suspect abuse was an arbitrary exercise of the state's power without any reasonable justification.

**Eighth Cause of Action**
**By Phillips and Condoluci Against County**
**Violation of Fourteenth Amendment Rights – Substantive Due Process**
**Based Upon The Home Visit**

436.     Plaintiffs repeat, reallege and incorporate all the allegations made above as though fully set forth herein.

437.     The home visit conducted by LaSusa without *any* cause to suspect abuse was an arbitrary exercise of the state's power without any reasonable justification.

438.     The home visit substantially impacted the family unit.

439.     The home visit without any cause to suspect abuse was an arbitrary exercise of the state's power without any reasonable justification.

**Ninth Cause of Action**
**By Phillips and Condoluci and T.C.P. Against County, Village and School District**
**Conspiracy to Violate Fourth and Fourteenth Amendment Rights**
**Based Upon The Interview of T.C.P.**

440.   Plaintiffs repeat, reallege and incorporate all the allegations made above as though fully set forth herein.

441.   There existed an agreement between the County, Village and School District to act in concert with one another to inflict an unconstitutional injury upon the children enrolled in the School District and their parents, including the plaintiffs.

442.   The County was instructed by the New York State Office of Children and Family Services to become familiar with each school district's policy, including the defendant School District, concerning the interview of children in schools.

443.   The School District was instructed by the New York State Department of Education to become familiar with CPS policy concerning interviews of children in school.

444.   The School District knew that in Orange County multidisciplinary teams consisting of police officers were conducting criminal investigations of parents concurrently with the CPS investigation of abuse and allowed such teams into the school for the purpose of investigating parents.

445.   The County and Village worked in concert together when creating the multidisciplinary team protocol that included conducting interviews of children in school as the first step in all investigations without reasonable or probable cause to suspect abuse, without parental consent, without a court order and without exigent circumstances.

446.    The County provided Village police officers with County business cards to conceal the fact that a criminal investigation was being concurrently conducted with the abuse investigation.

447.    The multidisciplinary team protocol provided that the members of the multidisciplinary team were not to reveal to those being investigated that police officers were concurrently conducting a criminal investigation with the abuse investigation.

448.    The County, Village and School District each took overt action in furtherance of inflicting the unconstitutional injury as set forth above.


WHEREFORE, plaintiffs pray that this Court grant them judgment containing the following relief:

a)   Compensatory damages against all defendants in the amount of Five Million Dollars ($5,000,000.00);

b)   Punitive damages against Scolza, Decker and Jankowski in an amount to be determined at trial;

c)   A permanent injunction enjoining all defendants from enforcing each of the policies complained of above;

d)   A declaration that each of the policies complained of above is unconstitutional; and


*Remainder of page intentionally left blank*

e)  For such other and further relief as this Court deems just and proper.


Dated: Goshen, New York
         June 17, 2011


                                          MARIE CONDOLUCI, PLLC


                                          By:_____/s/_____
                                                 Marie Condoluci (MC 6108)
                                                 60 Erie Street, Suite 401
                                                 Goshen, New York 10924
                                                 Phone:  (845) 591-5563
                                                 ECF:
                                                 mcondoluci@optonline.net

                                                 *Attorney for Plaintiffs*