UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
STEVEN J. PHILLIPS and MARIE CONDOLUCI,
individually and as parents and natural
guardians of T.C.P., an infant,

                    Plaintiffs,                          10-CV-00239 (KMK)

        - against -

COUNTY OF ORANGE,
BOARD OF EDUCATION GOSHEN
CENTRAL SCHOOL DISTRICT,
VILLAGE OF GOSHEN,
ANDREW SCOLZA, in his individual and
official capacity, JAMIE SCALI-DECKER,
in her individual and official capacity, and
MARY KAY JANKOWSKI, in her
individual and official capacity,

                    Defendants.
-------------------------------------------------------------------X


# PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS


                                    Respectfully Submitted,


                                    Marie Condoluci

                                    MARIE CONDOLUCI, PLLC
                                    Attorney for Plaintiffs
                                    60 Erie Street, Suite 401
                                    Goshen, New York 10924
                                    Phone: (845) 591-5563

# TABLE OF CONTENTS

Preliminary Statement................................................................ 1

Statement of Facts .................................................................. 3

Procedural Background............................................................. 11

Legal Argument

    **POINT I**

    **STANDARD OF REVIEW**................................................. 14

    **POINT II**

    **PLAINTIFFS HAVE ALLEGED A PLAUSIBLE CLAIM** .................... 14
    **FOR VIOLATION OF PROCEDURAL DUE PROCESS**
    **RIGHTS UNDER THE FOURTEENTH AMENDMENT**

        **A. The Due Process Clause Protects More Than Custody**............. 16

        **B. Plaintiffs Have Alleged A Custodial Interference** .................... 22

    **POINT III**

    **PLAINTIFFS HAVE ALLEGED A PLAUSIBLE CLAIM**.................... 23
    **FOR VIOLATION OF SUBSTANTIVE DUE PROCESS**
    **RIGHTS UNDER THE FOURTEENTH AMENDMENT**

    **POINT IV**

    **PLAINTIFFS HAVE ALLEGED PLAUSIBLE CLAIMS FOR**.............. 29
    **VIOLATION OF THEIR FOURTH AMENDMENT RIGHTS**

        **A. The Unreasonable In School Seizure** .................................. 29

        **B. The Unreasonable In School Search** ................................... 32

        **C. The Unreasonable Search of Plaintiffs** ............................... 33
        **Parental Interview and Home Visit**

     D. There is No "Special Needs" Exception ............................. 34

**POINT V**

**PLAINTIFFS HAVE ALLEGED A PLAUSIBLE CLAIM** .................... 37
**AGAINST THE SCHOOL DISTRICT AND VILLAGE**
**BASED ON POLICY, CUSTOM OR PRACTICE**

    A. The School District Policy................................................... 37

    B. The Village Policy ........................................................... 38

**POINT VI**

**PLAINTIFFS HAVE ALLEGED A PLAUSIBLE** ............................... 39
**CLAIM OF CONSPIRACY TO VIOLATE § 1983**

**POINT VII**

**THERE IS NO SEPARATE FAILURE TO TRAIN CLAIM** .................. 40

**POINT VIII**

**THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED** ................. 42
**TO DISMISSAL BASED ON QUALIFIED IMMUNTY**

**Conclusion** ................................................................................. 45

# TABLE OF AUTHORITIES

**Cases**

*Adler v. Pataki*, 185 F.3d 35 (2d Cir. 1999) ...................................................................17

*Agostino v. Simpson*, 08-CV5760 (CS), 2008 WL 4906140 (S.D.N.Y. Nov. 17, 2008)..............17

*Alabama v. White*, 496 U.S. 325 (1990) ..................................................................27

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009)...............................................................12

*Brennan v. County of Broome*, 2011 WL 2174503 (N.D.N.Y. June 2, 2011) ............................22

*Camreta v. Greene*, 588 F.3d 1011 (9th Cir. 2009)
*vacated on other grounds*, 131 S.Ct. 2020 (2011)...........................................*passim*

*City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000). ..............................................36

*Cornigans v. Mark Country Day School*, 2006 WL 3950335 (E.D.N.Y. 2006) ........19, 20, 21, 26

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998 ...............................................16, 24

*Cox v. Warwick Valley School Dist.*, 2011 WL 3631971 (2d Cir. August 17, 2011)...................25

*Croft v. Westmoreland County Children Youth Services*, 103 F.3d 1123 (3d Cir. 1997)........26, 28

*Daniels v. Murphy*, 2007 WL 1965303 (E.D.N.Y. July 2, 2007) ......................................21

*Doe v. Heck*, 327 F.3d 492, 521 (7th Cir. 2003)..................................................*passim*

*Duchesne v. Sugarman*, 566 F.2d 817 (2d Cir. 1977) ...................................................2

*Durven D. v. Giuliani*, 2000 WL 1145425 (S.D.N.Y. Aug. 11, 2000)................................. 21

*E.D. v. Tuffarelli*, 2010 WL 749837 (S.D.N.Y. March 2, 2010)..................................26

*Ferguson v. City of Charleston*, 308 F.3d 380 (4th Cir. 2002)....................................34

*Ferguson v. City of Charleston*, 532 U.S. 67 (2001)...........................................33, 36

*Florida v. Royer*, 460 U.S. 491 (1983). ...................................................34

*Greene v. Camreta*, 588 F.3d 1011 (9th Cir. 2009)...........................................13

*Holmes v. Poskanzer* 342 Fed.Appx. 651 (2d Cir. 2009)........................................42

*I.N.S. v. Delgado*, 466 U.S. 210 (1984) .................................................................................33

*J.B. v. Washington County*, 127 F.3d 919 (1997)........................................................................33

*J.D.B. v. North Carolina*, 131 S.Ct. 2394 (2011) .................................................................30

*Kenefic v. Oswego County*, 2010 WL 2977267 (N.D.N.Y. July 23, 2010) ..................................22

*Kia P. v. McIntyre*, 235 F.3d 749 (2d Cir. 2000)...............................................................29, 31

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991)………………………….........12

*Kyllo v. U.S.*, 533 U.S. 27, 33 (2001) .................................................................................29, 32

*Lapin v. Goldman Sachs Group, Inc.*, 506 F.Supp2d 221 (S.D.N.Y. 2006) ....................10, 14

*Lewis v. Krymkevich*, 2009 WL 4884093, * 12 (S.D.N.Y. Dec. 17, 2009) ..................................39

*MacWade v. Kelly*, 460 F.3d 260 (2d Cir. 2006).......................................................................36

*Malley v. Briggs*, 475 U.S. 335 (1986)......................................................................................42

*McKenna v. Wright*, 386 F.3d 432 (2d Cir.2004)......................................................................42

*Meyer v. Nebraska*, 262 U.S. 390 (1923).................................................................................15

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ................................................................................42

*Monell v. Dept' of Soc. Servs.*, 436 U.S. 658 (1978). ........................................................37, 38

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985) ..............................................................................35

*Nieves v. New York City Police Dep't*, 2010 WL 330205 (S.D.N.Y. January 26, 2010) ...........39

*Ohio v. Robinette*, 519 U.S. 33 (1996) .....................................................................................34

*Orlik v. Dutchess County*, 603 F.Supp.2d 632 (S.D.N.Y. 2009).............................................26

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)… ...............................................38, 39

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) ...................................................................15

*Prince v. Massachusetts*, 321 U.S. 158 (1944) ...................................................................27, 31

*Puricelli v. Houston*, 2000 WL 760522 (E.D. Pa., June 12, 2000) ..........................................30

*Safford Unified School Dist. No. 1. v. Redding*, 129 S.Ct. 2633 (2009)........................................42

*Shapiro v. Kronfeld*, 00-CV-6286 (RWS), 2004 WL 2698889 (S.D.N.Y. Nov. 24, 2004) .........21

*Southerland v. City of New York*, 2011 WL 2279186 (2d Cir., June 10, 2011) .....................42, 43

*Southerland v. Giuliani*, No. 00-7410, 2001 WL 127293 (2d Cir. Feb. 14, 2001) .....................21

*Tenenbaum v. Williams*, 193 F.3d 581 (2d Cir. 1999)........................................................ *passim*

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969)................31

*Troxel v. Granville*, 530 U.S. 57 (2000) .....................................................................................15

*U.S. v Berkolayko*, 2009 WL 3030303, 08 CR 1327 (S.D.N.Y. Sept. 22, 2009) .........................34

*U.S. v. Garcia*, 56 F.3d 418 (2d Cir. 1995) .................................................................................34

*U.S. v. Hunter*, 2008 WL 2074076 (W.D.N.Y. May 14, 2008)....................................................32

*U.S. v. Karo*, 468 U.S. 705 (1984)..............................................................................................32

*United States v. Hollingsworth*, 495 F.3d 795 (7th Cir. 2007).....................................................30

*van Emrik v. Chemung County*, 911 F.2d 863 (2d Cir. 1990) ................................................17, 18

*Vaughn v. Air Line Pilots Ass'n, Intern.*, 604 F.3d 703 (2d Cir. 2010) .........................................14

*Vernonia Sch. Dist. v. Acton*, 515 U.S. 646 (1995) ..............................................................19, 35

*Villanueva v. City of New York*, 2010 WL 1654162 (S.D.N.Y. April 14, 2010) .........................22

*Walker v. Elliott*, 2010 WL 4916715 (M.D.Pa. October 25, 2010)................................................43

*Williams v. Jurow*, 2007 WL 5463418 (S.D.N.Y. June 29, 2007) ................................22, 26, 30

*Winkler v. Grant*, 2010 WL 971897 (2d Cir. March 18, 2010)....................................................26

**Statutes**

Federal

Fed.R.Civ.P. 12(b)(6) ...............................................................................................42

State

N.Y. Social Services Law § 413 ...........................................................................5, 28, 43

N.Y. Social Services Law § 414 ...........................................................................5, 28, 43

N.Y. Social Services Law § 422 ..................................................................................4, 5

N.Y. Social Services Law § 424 ....................................................................................28

N.Y. Family Court Act § 1034 ..................................................................................5, 43

**Regulations**

18 N.Y.C.R.R. § 432.2.............................................................................................28, 41

**Administrative Directives**

Administrative Directive 07-OCFS-ADM-07, May 2, 2007.............................................43

## Preliminary Statement

Plaintiffs STEVEN J. PHILLIPS, MARIE CONDOLUCI, and T.C.P., respectfully submit this Memorandum of Law in opposition to the motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) of: 1) the COUNTY OF ORANGE (the "County ") and JAMIE SCALI-DECKER ("Scali-Decker"); 2) the BOARD OF EDUCATION GOSHEN CENTRAL SCHOOL DISTRICT (the "School District") and MARY KAY JANKOWSKI ("Jankowski"); and 3) the VILLAGE OF GOSHEN ("the "Village") and ANDREW SCOLZA ("Scolza"). [1]

Defendants' arguments in this case distill to a revolutionary legal concept: the public school in America is a constitution free zone because the parent and child both shed their constitutional rights the moment the child steps in the school. It is a place where the state can do with children as it deems fit, regardless of the parents' choices. A place where the police can conduct seizures and searches unhampered. Constitutional protections, Defendants argue, only come into play if and when the state seeks to physically remove the child from the school. The Supreme Court explicitly rejected this notion over 40 years ago.

Defendants also argue that the heinous nature of the crime alone is reason enough for the state to disregard **all** constitutional protections. Under Defendants' reasoning, individuals, witnesses and suspects alike, could be plucked off the street by the police and subjected to custodial interrogations based on nothing more than "hunches" or "guesses" so long as the crime being investigated was serious enough. The Supreme Court and Second Circuit have explicitly and rightfully rejected such a wholesale abandonment of constitutional protections merely because of the severity of the suspected crime.

---

[1] For ease of reference, the County and Scali-Decker shall collectively be referred to as the "County Defendants"; the School District and Jankowski collectively as the "School District Defendants; and the Village and Scolza collectively as the "Village Defendants."

Defendants next argue that they are entitled to immunity because they could not have known it was unconstitutional to question a five year old child about her private parts, bathing routine and sleeping habits without her parents' consent, without a court order, and without any reasonable cause to suspect that the child had been abused. Qualified immunity does not protect the plainly incompetent or actions based on a person's subjective beliefs. The standard speaks to what the "objectively reasonable" state actor would have believed or known. A police officer conducting a criminal investigation who does not know he is a police officer conducting a criminal investigation is plainly incompetent. Similarly, a caseworker and school social worker believing that any investigation may be conducted without reasonable cause to believe a child is abused are also plainly incompetent. Their subjective belief that reasonable cause existed before interrogating a five year old child does not make their actions objectively reasonable and immune.

Finally, Defendants claim that they were "protecting" children. Society's interest in protecting children, however, also encompasses an interest for the child's autonomy and relationship to the family. The mere battle cry of "protecting" children does not allow Defendants to ignore the fundamental Constitutional rights of those very same children or those of their parents for "[o]f all tyrannies a tyranny sincerely exercised for the good of its victims may be the most oppressive .... (T)hose who torment us for our own good will torment us without end for they do so with the approval of their own conscience." *Duchesne v. Sugarman*, 566 F.2d 817, 828, fn# 24 (2d Cir. 1977)(*quoting* Goldstein, Medical Care for the Child at Risk, 86 Yale L.J. 645, 649-650 (1977).

## Statement of Facts

It is axiomatic that all facts plead in the Third Amended Complaint must be accepted as true on these motions to dismiss under Fed.R.Civ.P. 12(b)(6). A copy of the Third Amended Complaint ("T.A.C.") is annexed as Exhibit "A" to the Declaration of Marie Condoluci dated September 23, 2011 submitted herewith ("Condoluci Decl.").

The Third Amended Complaint alleges that an individual with very little personal knowledge of the Plaintiffs, Robin Hogle, had a conversation with Thresa Falletta who bore personal animosity toward the Plaintiffs. (T.A.C. at ¶¶ 37, 42, 44, 48, 50). Hogle knew of the animosity also. (T.A.C. at ¶ 50).

In a conversation, Falletta told Hogle numerous falsehoods about the Plaintiffs and T.C.P.: that T.C.P. went to the school nurse a lot for no reason, that Plaintiffs had provocative photos of T.C.P. on their refrigerator, that Phillips spoke inappropriately about T.C.P.'s body and that Phillips slept with T.C.P. while Condoluci slept with their other daughter, R.S.C.P. (T.A.C. at ¶51 -54). Based on these false facts, Falletta went on to tell Hogle that she had "concerns" that Phillips was sexually abusing T.C.P. and that Condoluci was aware of the abuse and doing nothing. (T.A.C. at ¶ 54).

Because Hogle had received training to report all suspicions of abuse she called the State Central Registry ("SCR") to relay Falleta's mere "concerns." Hogle, however, had received no training on what reasonable cause to suspect abuse was or what number to call so she used the special unlisted phone number for mandated reporters only.[2] (T.A.C. ¶¶ 56-58).

---

[2] Contrary to the Village and School Distict's assertion that Hogle called the number "typically" used for mandated reporters, the Third Amended Complaint alleges, based upon statutory language, that she called the number "only" for mandated reporters. (School District MOL at p. 2)(Village Defendants;' MOL at p.2.)(T.A.C. at ¶¶ 16, 58).

Hogle told the SCR that she had "information" she was not sure what do with. (T.A.C. at ¶ 61.) She went on to state that "close friends" of the Plaintiffs had come to her and told her that the Plaintiffs have "nude pictures" of T.C.P. on their refrigerator which they explained as "art", that Phillips spoke inappropriately about T.C.P.'s body, that Phillips slept with T.CP., and that T.C.P. went to the school nurse a lot for no reason. (T.A.C. ¶ 62, 63).

Hogle went on to state that the "close friends" had witnessed specifics and confronted the family and that the close friends may have more details that Hogle could not divulge. Hogle refused, however, to provide the name or any contact information for the "close friends" who had come to her. (T.A.C. at ¶ 66). Hogle told the SCR that *none* of the "information" she was relaying was of her own personal knowledge but information brought to her by the "close friends", again whom she refused to name. (T.A.C. at ¶¶65).

While the SCR initially told Hogle that they did not believe there was sufficient information to take a report, they nonetheless took a report. Presumably, this error occurred because the SCR mistakenly thought Hogle was a mandated reporter since she used the special unlisted number and N.Y. Social Services Law § 422(2)(b) *requires* reports to be taken from mandated reporters containing allegations which if true would constitute child abuse or maltreatment. (T.A.C. at ¶¶ 17, 70)

Hogle, however, was not a mandated reporter because neither Phillips, Condoluci nor T.C.P. had ever come before Hogle in her professional or official capacity and stated from their personal knowledge facts, conditions, or circumstances that would have rendered T.C.P. an abused child. (T.A.C. at ¶ 18, 59). Had any of the Plaintiffs in fact come to Hogle in her official capacity and stated from their personal knowledge facts, conditions or circumstances that would have rendered T.C.P. an abused child, there would indeed have been reasonable cause to suspect

that T.C.P. was abused and that is why such reports ***must*** be taken under N.Y. Social Services Law § 422 (T.A.C. ¶ 17). The report here, however, was nothing more than Hogle's hearsay account of some anonymous person's "concerns" of abuse based on facts which Hogle had no personal knowledge of and which were, in large part, false. (T.A.C. at ¶68-71).

The report, taken in error, was immediately transferred to the County pursuant to statute.[3] (T.A.C. ¶¶ 70, 73). Nobody ever picked up the error because none of the County employees had adequate training as to what a mandated reporter was or what constituted "reasonable cause to suspect abuse." (T.A.C. ¶¶ 357-367). It was determined after a phone call by the County to Hogle that no action would be taken that day because the children were not in imminent danger and because schools were closed that day. (T.A.C. ¶¶ 74-83). While the County could have sought a court order for the production of T.C.P. for questioning that day under N.Y. Family Court Act § 1034, it would have been required to demonstrate that there was "reasonable cause to suspect that a child's life or health may be in danger." (T.A.C. ¶ 27).[4] The County decided to wait until the following day to take further action when T.C.P. could be questioned at school without the need for obtaining a court order since the School District Defendants allowed such

---

[3] The County Defendants, seeking to shift blame for this investigation from themselves to the SCR, assert in their memorandum of law, that "the County Department has a statutory duty to investigate all such reports which it received from the Central Register." (County Defendants' MOL at p. 2). Reports, however, also pursuant to State Law, are only to be taken when there is "reasonable cause to suspect" a child is abused. N.Y. Social Services Law §§ 413, 414. It was the County, not the SCR, that performed the investigation and thus it was incumbent on the County to ensure the report contained sufficient information to create reasonable cause to suspect abuse before commencing the investigation. The County Defendants cannot reasonably argue that they were required to conduct investigations of reports taken by mistake and in contravention of State Law. Moreover, the multidisciplinary protocol was the County and Village's ***choice***. *See Vives v. City of New York*, 524 F.3d 346 (2d Cir 2008)(defining the limits of *Monell* liability when enforcing state statutes.).

[4] Notably, Family Court Act § 1034 does not allow a court to order the production of a child for questioning merely on the basis that a report exists.

interviews as a matter of policy without parental consent, a court order or any showing that there was reasonable cause to suspect the child was abused. (T.A.C. ¶ 82, 140, 141)

The following day the report was assigned to Scali-Decker who had a case conference with her case supervisor at which time it was determined, without any independent investigation whatsoever and upon the mistaken belief that the report was from a mandated reporter, that Scolza would be assigned as the law enforcement member of the multidisciplinary team and that Scolza and Decker would interview T.C.P. at school that day. (T.A.C. ¶¶84-92).

Scali-Decker next called Hogle who reiterated that the report taken by the SCR was *accurate to what Hogle was told by Falletta* but again refused to provide Falletta's name or contact information. (T.A.C. ¶ 96-105). *The only statement made by Hogle to Scali-Decker from her own personal knowledge was that T.C.P. had attended a weeklong bible camp and had not exhibited any behavior or statements to raise any suspicion she had been abused.* (T.A.C. ¶ 102.).

Scali-Decker next called T.C.P.'s school and asked nothing but whether T.C.P. was in school that day. She deliberately ignored one of the few factual statements made by Falletta that could be corroborated: whether T.C.P. went to the school nurse a lot for no reason. (T.A.C. at 110-117). She had no desire or intention of corroborating any of Falletta's factual statements because the team protocol required that the child be interviewed first, in school without parental consent, without exigent circumstances, and without a court order. (T.A.C ¶ 125).

Scolza next joined the investigation as the law enforcement member of the multidisciplinary team upon the request of the County, pursuant to an intermunicipal contract that obligated him to do so. (T.A.C. ¶¶ 118, 320). Another case conference was held between Scolza, Smith and Scali-Decker where it was again agreed by all present, without performing any

other investigation, that T.C.P. would be interviewed in school that day without parental consent or a court order as was protocol in all the multidisciplinary team investigations.[5] (T.A.C. ¶¶ 118-126).

Scolza and Scali-Decker went to T.C.P.'s school, showed their identification and waited for her in the Assistant Principal's Office. They asked no questions of anyone that had daily personal contact with her– not her teacher, the school nurse, no one - because their only objective at that point was to get five year old T.C.P. in a room to interrogate her about her family's home life. That was the protocol. (T.A.C. ¶¶ 127-145, 325).

T.C.P. was removed from her kindergarten class by Jankowski, brought to the office of the Assistant Principal and the door closed with Jankowski, Scali-Decker and Scolza present. None of the Defendants offered for T.C.P. to call her parents nor did any of them inform her she was free to leave the room. (T.A.C. ¶¶ 145-148).

For forty-one minutes they questioned five year old T.C.P. with the door closed, probing every single aspect of intimate matters of her home life, including whether her parents fought, how and who bathed her, where she slept, what kind of T.V., magazines and computer programs were available in the home, and if she was ever spanked (T.A.C. ¶¶ 154-155). They waited for the very end of the questioning to ask whether there were any nude pictures of her in the home to which she responded "no." (T.A.C. ¶ 158-159). All T.C.P.'s answers to the questions revealed that she was quite well cared for and in no way abused. (T.A.C ¶ 161).

***After they questioned T.C.P.***, they asked school personnel whether there were any concerns and whether T.C.P. went to the school nurse for no reason. (T.A.C ¶¶ 165-168). The

---

[5]   The Village Defendants assert that Scolza was not alleged to have been present during the meeting wherein it was determined that T.C.P. would be interviewed at school. (Village Def.'s Mol at p. 3.). While Scolza was not present for the initial meeting, he was present for this second meeting where everyone agreed, including Scolza, that T.C.P. would be interviewed.

School District Defendants confirmed that they had no concerns for T.C.P. and that T.C.P. *did not* go to the school nurse a lot for no reason. (T.A.C. ¶ 165-166).

After the Defendants had extracted all the information they wanted from T.C.P., Scali-Decker finally notified T.C.P.'s parents that there had been a report made against them and that Defendants had questioned their daughter that afternoon while she was at school. (T.A.C. ¶¶ 179). Scali-Decker refused, however, to reveal the nature of the allegations made in the report unless Phillips and Condoluci came down for an interview with her and "her partner" and allowed them to observe their two year old daughter, R.S.C.P. (T.A.C. ¶181-187). The Plaintiffs acquiesced. (T.A.C. ¶¶ 189-190).

The interview and "observation" of R.S.C.P. took place the following day. Immediately prior to the interview Falletta called Scali-Decker refusing to provide her name but stating that she was Hogle's source of "concerns". (T.A.C. ¶¶ 193-196). Falletta gave none of the "specifics" she told Hogle she had witnessed. She relayed her "concerns" that T.C.P. was very smart and, upon inquiry from Scali-Decker, about T.C.P.'s "provocative" mermaid costume that looked like it came from "Frederick's of Hollywood." (T.A.C. ¶¶ 200-221). Falletta disclosed no knowledge of T.C.P. acting out sexually and denied that T.C.P. had ever disclosed any inappropriate actions by her father. (T.A.C 201).

The interviews of Phillips and Condoluci came next with Scolza identifying himself throughout the process as an "Investigator" for the Orange County Department of Social Services. Scolza and Scali-Decker asked the Plaintiffs whether anybody "had it in for them." (T.A.C. ¶¶ 239-259). The alleged "provocative" mermaid pictures were shown to Scali-Decker who noted that they were not inappropriate or provocative in any way and, in fact, asked where she could buy one. *Id.* The only fact acknowledged by plaintiffs as accurate was that Phillips

used foul language with other parents and that both parents slept with their children.[6] –*Id.* Their two year old daughter was observed the entire time and they were asked questions about their sleeping arrangements, whether they fought or used alcohol, and to produce the photos of T.C.P. in the mermaid costume. (T.A.C. ¶¶ 230, 233, 246, 252). [7] At the conclusion of the interviews and despite being aware that Falletta had given false information to Hogle, Scali-Decker stated that she was "required to" conduct a home inspection which was scheduled for the next day.(T.A.C. ¶¶ 256-262).

The home visit was conducted the next day with a different senior caseworker insisting to see the bedrooms where the children slept and forcing the plaintiffs to defend their sleeping arrangements to him. (T.A.C. ¶¶280-295). He also mistakenly believed the report came from a mandated reporter and cautioned plaintiffs to be careful what they said to others because there were many "small-minded" people in Orange County. (T.A.C. ¶¶ 276-284). The case was deemed unfounded and administratively closed ten days after Hogle's call to the SCR.

After every single aspect of the plaintiffs' familial privacy had been invaded - their five year old daughter seized, their two year old daughter "observed", their home life probed, their bedrooms inspected – the Defendants finally realized that Hogle had not been a mandated reporter at all. (T.A.C. P¶ 300-305). This enlightenment came about only because Condoluci

---

[6] The Village Defendants note in their Memorandum of Law that Phillips acknowledged using foul language with other parents and that the complaint does not allege that children were never present when he used foul language. (Village Defendants' MOL. at p. 5.) If a parent's use of foul language in front of their children created "reasonable cause" to suspect sexual abuse, nearly every child in America would be in the Assistant Principal's office being questioned by the police and CPS. It is not. The Village Defendants have failed to cite any authority where an abuse investigation such as this one was conducted solely upon the grounds that a parent used foul language in front of their child.

[7] The Village Defendants state that "there is no allegation" that any questions were asked of R.S.C.P. (Village Def.'s MOL at p. 5.) Of course not, she was two years old.

had pressed for charges to be brought against Falletta as Hogle's anonymous source and an attorney in the district attorney's office at last looked at the statutes regarding mandatory reporters. It was ultimately determined that charges could not be brought against Falletta because Hogle was not a "mandated reporter". (T.A.C. ¶¶ 300-305).

Defendants attempt, through their own version of the facts, to put this case in the same class as those where abuse investigations were launched upon reasonable cause to suspect a child been abused. It is not.. [8]

The County Defendants assert there was "a report of alleged child sexual abuse allegedly committed by Plaintiff Phillips in this case." (County Defendants' MOL at p. 2.). As stated above, however, that report based on an anonymous person's "concerns" did not contain reasonable cause to suspect abuse but was the result of a mistaken belief that Hogle was a mandated reporter – a fact that the County Defendants would have realized had they received adequate training. Moreover, many of the key facts that formed the basis for the anonymous person's "concerns" were false – a fact the County and Village Defendants would have known had they conducted even the slightest independent investigation before storming the school to seize and interrogate a five year old child. Rather, their joint abuse/criminal investigation protocol was the constitutional equivalent of "shoot first and ask questions later."

The Village Defendants state Hogle called the SCR "to report serious allegations of sexual abuse by plaintiffs against their minor daughter…" (Village Defendants' MOL at p.2.).

---

[8] The School District Defendants are the only parties that acknowledge they have referenced facts outside the pleadings but argue that it's permissible because their facts are "integral" to the plaintiff's allegations and causes of action. (School District Def. MOL at p.2.) The School District's own legal citations, however, hold only that "documents" that are integral to plaintiff's claims may be considered and, even then, may not be considered for their truth. *See Lapin v. Goldman Sachs Group, Inc.*, 506 F.Supp2d 221, 229, at fn # 1(S.D.N.Y. 2006)(documents filed in another court may be considered, but "not for the truth of the matters asserted").

The School District Defendants state Hogle called the SCR "to report the suspected sexual abuse of TCP." (School Defendants' MOL at p. 2.). While these facts would no doubt make the defendants' actions more "reasonable" in the Fourth and Fourteenth Amendment analysis, they are not the facts.[9] Hogle conveyed another anonymous persons "concerns" of abuse based on false facts.(T.A.C. ¶¶ 61-66). [10]

## **Procedural Background**

This case has a long and tortuous history without discovery even having been commenced yet. For purposes of this motion, Plaintiffs will highlight only relevant events. The Plaintiffs commenced this action on January 13, 2010 against the County and School District alleging violations of their right to family integrity under the Fourteenth Amendment and a conspiracy by the County and School District. The County and School District requested to make motions to dismiss and the Court held a pre-motion conference on March 17, 2010 at which time Plaintiffs' were given leave to amend to add the individual defendants and Fourth Amendment claims. In April 2010 the County Defendants first informed the Plaintiffs and the Court that Scolza was a Village of Goshen police officer and the Court granted Plaintiffs leave to file a second amended complaint to add the new information and the Village as a party.

---

[9]  Defendants' repeated misstatements of the facts are nothing more than a revictimization of a family that has already suffered at the hands of their incompetent workers and unconstitutional policies. Such statements, made by all Defendants throughout this action, are clearly not made for any proper purpose.

[10] Defendants state in varying ways that their actions were reasonable because they could not have known Hogle's facts were false. They also could not have known them to be true. It is the parent, not the anonymous source, that is constitutionally entitled to the presumption that they act in the best interest of their children absent clear and articulable evidence otherwise. *Doe v. Heck*, 327 F.3d 492, 521 (7th Cir. 2003). The Defendants in this action assumed the exactly opposite, that the anonymous source was acting in the child's interest. *Id.*

The first round of Defendants' motions to dismiss were fully briefed on July 8, 2010. No motion to stay discovery was ever made by Defendants. On February 25, 2011, the County Defendants wrote a letter informing the Court that the Supreme Court had granted certiori in the Ninth Circuit case of *Greene v. Camreta*, 588 F.3d 1011 (9th Cir. 2009) which, according to the County Defendants, would "likely resolve clarify the law as to due process in this area."

In reliance on the County's letter, by Order dated March 1, 2011, this Court denied the Defendants' motions to dismiss without prejudice pending a decision from the Supreme Court in *Greene*.

On March 1, 2011, the Supreme Court held oral argument. Prior to the argument (relevant portions of which are annexed to the Condoluci Decl. as Exhibit "B"), eighteen various family rights groups filed *amicus* briefs in support of the Respondent child urging, in varying aspects, that the Supreme Court hold such in school interviews unconstitutional under the Fourth and/or Fourteenth Amendment.[11] Despite the concession of a seizure by the petitioning caseworker in that case, the Justices probed both the petitioner and respondent attempting to determine what rule they wanted the Court to formulate with respect to seizures arising from in-school interviews.[12]

On May 26, 2011 the Supreme Court rendered a decision in *Greene* which failed to reach the merits of the Fourth Amendment issue. On May 27, 2011 Plaintiffs sought and the Court

---

[11] The oral argument transcript and *amicus* briefs are adjudicative facts which this court may take judicial notice of pursuant to Fed.R.Evid. 201 and properly consider on this 12(b)(6) motion. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

[12] Most pointedly, Justice Sotomayor asked the petitioner "[w]hat's the standard? I mean, I just assume you're not suggesting this procedure could be used with every child in every school without some ground for suspicion, correct?" The petitioner responded, "[n]o Your Honor, we believe that reasonable suspicion is the – is the proper basis before making a seizure of a child to conduct one of these inquiries." (Condoluci Decl., Exhibit "B", at p. 55.)

granted leave to file the Third Amended Complaint which was filed on June 17, 2011. The Court held a pre-motion conference on July 29, 2011 at the Defendants' request at which time the instant motion to dismiss briefing schedule was set. The Court also addressed Plaintiffs' request for permission to file a sanctions motion against all Defendants which Plantiffs agreed would be made after the current motion was submitted and in compliance with Fed.R.Civ.P. 11.

The Third Amended Complaint sets forth nine causes of action all premised on 42 USC 1983:

1) By T.C.P. against all Defendants for an unreasonable seizure in violation of her Fourth Amendment rights based on her interrogation at school;

2) By all the Plaintiffs against all Defendants for an unreasonable search in violation of their Fourth Amendment rights based on T.C.P.'s interrogation at school;

3) By Phillips and Condoluci against the County Defendants and Village Defendants for an unreasonable search in violation of their Fourth Amendment rights based on the interviews of them;

4) By Phillips and Condoluci against the County Defendants for an unreasonable search in violation of their Fourth Amendment rights based on the home visit;

5) By Phillips and Condoluci against all Defendants for violation of their procedural due process rights under the Fourteenth Amendment based on the interrogation of T.C.P.;

6) By all Plaintiffs against all Defendants for violation of substantive due process rights under the Fourteenth Amendment based on the interrogation of T.C.P.;

7) By Phillips and Condoluci against the County and Village Defendants for violation of substantive due process rights under the Fourteenth Amendment based on the interviews of them and observation of R.S.C.P.;

8) By Phillips and Condoluci against the County Defendants for violation of substantive due process rights under the Fourteenth Amendment based upon the home visit;

9) By all Plaintiffs against County, Village and School District for conspiracy to violate Plaintiffs' Fourth and Fourteenth Amendment rights.

**Legal Argument**

## I.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must set out only enough facts to state a claim for relief that is *plausible* on its face." *Vaughn v. Air Line Pilots Ass'n, Intern.*, 604 F.3d 703, 709 (2d Cir. 2010)(emphasis in original). The standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. The allegations of the Third Amended Complaint must be accepted as true and all reasonable inferences drawn in the Plaintiffs' favor. *Lapin*, 506 F.Supp2d at 229, fn #1.

## II.

## PLAINTIFFS HAVE ALLEGED A PLAUSIBLE CLAIM FOR VIOLATION OF PROCEDURAL DUE PROCESS UNDER THE FOURTEENTH AMENDMENT

There is only one claim for violation of the Plaintiffs' procedural due process rights, the Fifth Cause of Action based on the in-school seizure and interview of T.C.P. conducted without a court order, without parental consent, without exigent circumstances and without reasonable cause to suspect T.C.P. had been abused.

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." *Tenenbaum v. Williams*, 193 F.3d 581, 592 (2d Cir. 1999). The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests protected by the Fourteenth Amendment. *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535 (1925). "Choices about marriage, family life, and the upbringing of children are among the associational rights [the Supreme] Court has ranked as of basic importance in our society ... rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *Tenenbaum*, 193 F.3d at 593 (*quoting in part M.L.B. v. S.L.J., 519 U.S. 102, 116 (1996)*).

The child is not merely a creature of the State whose care can be doled out at the whim of a legislature, administrative agency or court. *Meyer*, 262 U.S. at 399-400; *Pierce*, 268 U.S. at 535; *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000). Instead, "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). "And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter." *Id.*

Thus "[b]efore parents may be deprived of the care, custody or management of their children without their consent, due process – ordinarily a court proceeding resulting in an order permitting removal – must be accorded them." *Tenenbaum*, 193 F.3d at 593.

Defendants argue, in contravention of explicit Second Circuit precedent, the district courts have created a *per se* rule in this circuit that only facts alleging a physical removal of the child from the parent's custody can plausibly state a claim for violation of procedural due

process rights.[13]  This is wrong:  The Second Circuit, and the Supreme Court, have found

parental due process rights implicated on facts with no custodial interruption, especially in those

instances where the State purports to know better what's best for the child.  Moreover, even

accepting the Defendants' "custodial interference" rule as true, the Third Amended Complaint

does allege a custodial interference when the Defendants seized T.C.P. at her school.

### A.  The Due Process Clause Protects More Than Custody

"The Supreme Court's decisions protect more than the custody dimension of the parent-

child relationship."  *Patel v. Searles*, 305 F.3d 130, 139 (2d Cir. 2002)(*quoting Bell v. City of*

*Milwaukee*, 746 F.2d 1205, 1245 (7th Cir. 1984)), *overruled on other grounds by Russ v. Watts*,

414 F.3d 783 (7th Cir. 2005).  In *Patel*, the plaintiff argued an impairment to the relations

between himself and his *adult* children.  Defendants argued, as the Defendants in this case, that

the interference with the familial relationship was not severe enough to warrant constitutional

protection.  The Second Circuit flatly rejected that argument calling it "draconian and

formalistic" as well as inconsistent with the Supreme Court's ruling in *Roberts v. United States*

*Jaycees*, 468 U.S. 609 (1984) that "constitutional protections for associational interests are at

their apogee when close family relationships are at issue."  *Patel*, 305 F.3d at 137.[14]

---

[13]  This argument also seeks to create a "matter of rule" for due process cases in general.  Due process of law is a fluid concept and "asserted denial is to be tested by an appraisal of the totality of facts in a given case."  *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)(*quoting Betts. V. Brady*, 316 U.S. 455, 462 (1942)).

[14]  The County Defendants seek to brush off this broad sweeping statement in *Patel* as limited to the facts of that case, as if the relationship between an adult child and parent should be afforded more protection than that between a very young child and parent.  If anything, the very young child and parent relationship is a much closer, intimate relationship that should be afforded more protection.  In any event, the Second Circuit held that even the adult child and parent relationship was entitled to "the greatest degree of protection."  *Patel*, 305 F.3d at 136.  Moreover, plaintiffs' here have alleged that the interview and ensuing investigation impaired the family relationship by alleging that it "drove a wedge into the family that eroded the family's solidarity internally

The only circuit that has addressed the procedural due process issue based on the interview of a child at school is the Seventh Circuit in *Doe v. Heck*, 327 F.3d 492, 522 (7th Cir. 2003), which found the interview violated the parents' due process rights. There, two caseworkers, with no police officer present, interviewed a fourth grade student at his private school over the objections of the school's principal. As was the case here, the caseworkers performed the interview without a court order, without the parent's consent, and without exigent circumstances. The student was brought to the nursery section of the church where he was questioned for approximately twenty minutes by the caseworkers alone and asked whether he was spanked by his parents, what his father's military history was and where his sister attended school. The parents, as with the plaintiffs here, never lost custody of their child and the caseworker, as here, did not have a reasonable basis to believe the child was abused. The Court held the interview violated the parents' procedural due process rights because it had amounted to a seizure under the Fourth Amendment and a violation of their right to familial relations under a substantive due process analysis. Plaintiffs here similarly assert Fourth Amendment and substantive due process violations arising from the interview.[15]

The Second Circuit has also found violations of procedural due process apart from a child's removal from custody. In *Tenenbaum* and *van Emrik v. Chemung County*, 911 F.2d 863

---

and impaired the family's ability to function as a unit" and that the impact was "devastating." (T.A.C ¶¶ 306, 307). These allegations are sufficient to implicate plaintiffs' rights. *See Patel*, 305 F.3d at 138 (devastating impact on family stated claim); *Adler v. Pataki*, 185 F.3d 35, 44 (2d Cir. 1999)(employee fired in retaliation for wife's discrimination suit could maintain § 1983 suit); *Agostino v. Simpson*, 08-CV5760 (CS), 2008 WL 4906140, at * 5 (S.D.N.Y. Nov. 17, 2008)(conduct that "impaired and strained" relationship with father sufficient to state a claim).

[15]   Of course, the Ninth Circuit in *Camreta v. Greene*, 588 F.3d, 1011 (9th Cir. 2009), *vacated on other grounds*, 131 S.Ct. 2020 (2011) also found the in school interview of a nine year old child in public school without parental consent, without a court order and without exigent circumstances a seizure under the Fourth Amendment. There were no due process claims, procedural or substantive, in that case based on the interview.

(2d Cir. 1990), the Second Circuit found that subjecting a child to a medical examination and x-rays at the behest of State officials for investigatory purposes, without consent, without a court order and without emergency circumstances violated the child and parent's procedural due process rights because "the liberty interest of parents in the care, custody, and management of their child ... includes a significant decision-making role concerning medical procedures sought to be undertaken by state authority upon their children." *van Emrik*, 911 F.2d at 867. "That interest assumes special significance when the procedures undertaken at the initiative of a state official serve primarily an investigative function; in such circumstances, Fourth Amendment and bodily integrity interests of the child are implicated." *Id.*

The medical exam and x-rays of the children in *Tenenbaum* and *van Emrik* were not found to violate procedural due process merely because it was accompanied by an interruption of custody. Quite the contrary, the Second Circuit clearly indicated that its constitutional analysis of the medical exam and x-rays was separate from the custody analysis.

Here, Plaintiffs assert that their liberty interest in their care, custody and management of T.C.P. includes a significant decision-making role concerning if, whom, when and where their five year old daughter discusses her "private parts" and other most intimate matters of her home life.(T.A.C. ¶423-424). As in *van Emrik*, the Plaintiffs' liberty interest here has special significance because the interview was undertaken at the initiative of the state to serve primarily an investigative function. Defendants offer no argument as to why the care, custody and control liberty interest of a parent does not, or should not, include such a decision-making role. Nor do the Defendants distinguish the reasoning in *Tenenbaum* and *van Emrik* that a parents' decision making role for their children is a protected liberty interest.

Defendants cite to snippets from assorted district court cases, mostly inapposite, for their *per se* rule that nothing short of a custodial removal *in this circuit* can amount to a violation of procedural due process.[16]

All the Defendants cite heavily to *Cornigans v. Mark Country Day School*, 2006 WL 3950335 (E.D.N.Y. 2006). The *Cornigans* decision was on a motion for summary judgment. There, the interview was conducted in a private school with the school's consent.[17] No objection from the school's principal as had occurred in *Doe v. Heck*. A teacher in the school, in fact, had called in the report. The interview that occurred in this case took place in a public school where the school lacked the authority to consent to the interview on behalf of the parents – there was no consent here just as there was no consent in *Doe v. Heck*.

The report to CPS in *Cornigans* was made by the child's teacher, – a true mandated reporter  - to the state central register after the child herself made statements to the teacher suggesting her father touched her inappropriately. When making the report, the teacher also discussed "cumulative" behavior of the child that gave the teacher reasonable cause to suspect the child had been abused. *Cornigans*, at * 2. There, the report being investigated created reasonable cause to suspect the child had been abused. Here, as in *Doe v. Heck*, the report being investigated created no such reasonable cause to suspect the child was abused.

No discussion whatsoever appears in *Cornigans* about the multidisciplinary protocol, the immediate objective of questioning the child or the questions posed during the interview.

---

[16]  Defendants are aware that such a statement could not be made in the Seventh Circuit in light of *Doe v. Heck*.

[17]  A private school acts *in loco parentis* and may consent to searches and seizures of their students unlike a public school where attendance is compulsory. *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 654 (1995).

The plaintiffs in *Cornigans* did bring Fourteenth Amendment claims for the violation of their right to family integrity but did not specify whether the claims were for procedural or substantive due process. No Fourth Amendment claims were brought so there was never an analysis or determination of whether the child had been seized as there was in *Doe v. Heck* and *Camreta v. Greene, supra*.

In finding that the interview of the child did not amount to a violation of the parents procedural due process rights Magistrate Judge Wall stated that "[t]he plaintiffs have not identified any case holding that interviewing a child at her school in connection with an abuse investigation without the parents' consent or notice constitutes a removal or other interference triggering due process interests, and the court has found none" *Id.* at *6. The Plaintiffs in this case have identified two Circuit cases holding such: *Doe v. Heck, supra,* and *Camreta v. Greene, supra*.

*Cornigans* is not binding precedent on this Court. *Cornigans* neither cited, discussed, distinguished or otherwise considered the Seventh Circuit's decision in *Doe v. Heck*. The *Cornigans* Court explicitly stated that it could not find any other cases involving an interview of a child that implicated due process rights. Even had it found *Doe v. Heck*, it would have been distinguishable because in *Doe* the interview was not consented to and there was no reasonable cause to suspect the child was abused.

The County Defendants also contrarily argue that *Cornigans* is a case "with almost identical facts to this one" yet assert that *Doe v. Heck* "has little relevance to the facts of this case." because it involved an interview in a private school" (County Def.'s Mol at p. 8, 24). The interview in *Cornigans* took place in a private school also, but with the consent of the school who was cloaked with parental authority. The consent of the school in that case amounted to

consent of the parents. Of the two cases, it is *Doe v. Heck*, not *Cornigans*, whose facts are more

closely analogous to this one. In *Doe v. Heck* there was no consent to the interview and there was

no reasonable cause to suspect that the child had been abused.

    *Daniels v. Murphy*, 2007 WL 1965303 (E.D.N.Y. July 2, 2007), was a motion to dismiss

case. The plaintiff's complaint alleged due process violations by CPS workers "while

performing some unspecified duty relating to the child custody determination." Id. at *3. There

were no allegations of an interview such as was conducted here or of the ages of the children.

The *Daniels* Court did distinguish, however, the Second Circuit's unpublished decision in

*Southerland v. Giuliani*, No. 00-7410, 2001 WL 127293 (2d Cir. Feb. 14, 2001).

> In *Southerland*, the court held that a father had sufficiently pled Section 1983
> procedural and substantive due process claims where he alleged that a New York
> City agency had seized his children without providing a proper hearing and
> without a reasonable basis for the seizure....

*Daniels*, at *4, fn # 9.

    *Daniels* went on to quote from *Southerland* that "[w]e have never required – as

the district court apparently did – that parental rights be completely terminated in order

for constitutional protections to apply." *Daniels*, 2007 WL 1965303, at * 9 (*quoting*

*Southerland v. Giuliani*, 2001 WL 127293, at *1 (2d Cir. 2001). Plaintiffs in this case

allege **exactly** what was found to state a procedural and substantive due process claim in

*Southerland*, the seizure of their child by the state with no reasonable basis. *Daniels*

supports Plaintiffs' arguments in this case, not Defendants'.

    Defendants' remaining cases are also unpersuasive. *See Shapiro v. Kronfeld*, 00-

CV-6286 (RWS), 2004 WL 2698889 (S.D.N.Y. Nov. 24, 2004)(on summary judgment,

interviews conducted father's permission); *Durven D. v. Giuliani*, 2000 WL 1145425

(S.D.N.Y. Aug. 11, 2000)(on summary judgment, the "undisputed evidence" in that case

was that the parent had consented to the interview); *Williams v. Jurow*, 2007 WL 5463418 at * 14 (S.D.N.Y. 2008)(unopposed pro se motion to dismiss, child was in "imminent danger" from medical untreated condition when caseworker visited school, no interview); *Villanueva v. City of New York*, 2010 WL 1654162 (S.D.N.Y. April 14, 2010)(custodial interference case with no interview); *Kenefic v. Oswego County*, 2010 WL 2977267 (N.D.N.Y. July 23, 2010)(motion to dismiss, no interview or specific claim of how the plaintiffs due process were violated); *Brennan v. County of Broome*, 2011 WL 2174503 (N.D.N.Y. June 2, 2011)(no seizure of child).

## B. Plaintiffs Have Alleged a Custodial Interference

Even were this Court to find that procedural due process rights are only triggered when there is a coinciding interference with custody- a proposition that is contradicted by Second Circuit and Supreme Court authority – the Plaintiffs here have alleged such an interference by the Fourth Amendment seizure of T.C.P. Under Defendants' own arguments, therefore, Plaintiffs' have plausibly alleged a procedural due process claim.

Finally, the County Defendants argue that the relevant Defendants "had short interviews with certain defendants, which does not nearly create such a deprivation to trigger any right to a court proceeding." (County MOL at p. 11). Plaintiffs disagree.

This was a forty one minute seizure by the state of a five year old child that was purposely undertaken without the knowledge or consent of her parents, for purely investigatory purposes, where the child was required to answer questions of two strangers – one male – about the most intimate details of her and her parents' life, including the child's private parts. The most fundamental aspects of the parents' decisions concerning her upbringing were questioned, i.e. how her parents bathed her, where she slept. Moreover, what parent has not taught their

22

child "don't talk to strangers." This is especially true of young daughters when they are confronted by strange adult men who want to discuss their private parts. This "interview" was a direct usurpation of the parents' choices concerning the upbringing of their daughter and plaintiffs were most certainly entitled to procedural protections before it took place without their consent.

In sum, neither the Supreme Court nor the Second Circuit has ever held that the protections afforded by procedural due process only protect a parent's custody interest in their child. Even if they did, Plaintiffs here alleged an interference with their custodial rights in the seizure claim. The facts set forth in the Third Amended Complaint present more than a plausible, but probable, claim for violation of the Plaintiffs' procedural due process rights.

## III.

### PLAINTIFFS HAVE ALLEGED A PLAUSIBLE CLAIM FOR VIOLATION OF SUBSTANTIVE DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT

There are three causes of action for violation of the Plaintiffs' substantive due process rights, the Sixth, Seventh and Eighth Causes of Action based on the in-school seizure, the interviews of Condoluci and Phillips wherein their two year old daughter was observed, and the home visit.[18]

---

[18] The Village Defendants argue that where a more explicit textual source of constitutional protection applies, the more generalized notion of substantive due process cannot. (Village MOL at p. 6). Nowhere, however, do the Village Defendants concede that Plaintiffs' Fourth Amendment rights were violated. Quite the opposite. The Village Defendants do not understand the difference between a motion to dismiss and a motion for summary judgment. In any event, Plaintiffs may indeed ultimately prevail on both their substantive due process and Fourth Amendment claims. *Doe v. Heck*, 327 F.3d at 519, fn # 23(where familial relations claim alleges seizure coincided with other conduct amounting to an interference with the parent child relationship, e.g. custodial interview without parental consent and without reasonable suspicion of abuse, that allegation of harm constitutes a separate and distinct violation and both claims may be maintained).

"Substantive due process rights guard against the government's 'exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" *Tenenbaum*, 193 F.3d at 600. Plaintiffs agree that in order to be liable on a claim for substantive due process the state action must be "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Tenenbaum*, 193 F.3d at 600. Again, mechanical rules of construction do not lend themselves to a proper due process analysis because "that which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in light of other considerations, fall short of such denial." *County of Sacramento*, 523 U.S. at 850.

The actions undertaken by the Defendants in this action were "shocking", "arbitrary", and "egregious", in a constitutional sense, because the report which prompted the questioning of T.C.P. did not even give rise to reasonable cause to suspect that she had ever been abused. Moreover, the intrusive investigation that ensued after the questioning – requiring plaintiffs be interviewed and 2 year old daughter be "observed"[19], requiring a home inspection, requiring to "see the bedrooms", requiring the plaintiffs to defend their family's sleeping arrangements - was clearly an exercise of the state's power "without any reasonable justification" since at that point in time the Village and County Defendants had absolutely no cause, reasonable or otherwise, to suspect that Plaintiffs' children were abused in any way.

---

[19] The Village Defendants assert that Scolza only "observed" their daughter. (Village MOL at p. 10) As alleged in the Third Amended Complaint, however, Plaintiffs were asked questions by both Scolza and Scali-Decker about their sleeping arrangements, whether they fought, whether they used alcohol and asked to produce pictures of their five year old daughter in a mermaid costume . (T.A.C. 230, 252). The Village Defendants repeated reliance on their own set of facts, that contradict those in the Third Amended Complaint, demonstrate they do not grasp the difference between a motion to dismiss and a motion for summary judgment.

The "difficult balancing that caseworkers must perform" (County Def.'s MOL at p. 14) between the state's interest in protecting children and the parents liberty interest in the care custody and management of their child never came into play in this case because the Defendants' never had reasonable cause to suspect T.C.P. was abused.[20]

The State's interest in protecting children, the interest which Defendants claim they were exercising here, only arises when there is

> some definite and articulable evidence giving rise to a reasonable suspicion that a child had been abused or was in imminent danger of abuse..clear and articulable evidence (internal citations omitted). If not, neither the state nor its officials have any interest whatsoever 'in protecting children from their parents' and no further inquiry is necessary.

*Doe v. Heck*, 327 F.3d at 521.

As in the procedural due process argument, Defendants seek to create a *per se* rule that, *in this circuit*, no interference with familial relations below a custodial interference can ever amount to a violation of substantive due process rights. All the Defendants' cases, however, are easily distinguishable because they were all investigations launched upon reasonable cause to suspect a child had been abused and, therefore, the Courts there were required to engage in the "balancing of the interests" test. In this case, without the "clear and articulable" evidence of abuse, there is no balancing because there's no weight to put on the Defendants' side of the scale – Defendants had no interest in protecting T.C.P. *See Cox v. Warwick Valley School Dist.*, 2011 WL 3631971 (2d Cir. August 17, 2011)(thirteen year old child wrote essay describing shooting himself in the head accompanied by abuse and neglect disclosed by student's words or acts);

---

[20] The Defendants' actions and policies in this case do not reflect in any way a "difficult balance" that was struck between the state's interest and the parents' due process rights. Defendants' entire protocol was geared solely on obtaining evidence as quickly as it could against the parents regardless of the intrusions into family privacy. While state officials have "necessary latitude" in conducting an investigation, they do not have "infinite license." *Tenenbaum*, 193 F.3d at 595.

*Cornigans*, supra, (child disclosed being inappropriately touched by her father along with cumulative behavior observed by the child); *Tenenbaum, supra*, (child was crying and disclosed father hurting her in the groin area); *Williams v. Jurow*, (mother refused to seek medical attention for her son's asthma and heart condition); *Winkler v. Grant*, 2010 WL 971897 (2d Cir. March 18, 2010)(child removed on an emergency basis after police responded to a domestic dispute call to child's home); *E.D. v. Tuffarelli*, 2010 WL 749837 (S.D.N.Y. March 2, 2010), *aff'd*, 408 Fed. Appx. 448, 2011 WL 294023(2d Cir. Feb. 1, 12011)(child removed on emergency basis when CPS caseworker personally observed child cooking over an open flame with a knife within reach and injuries to the face which mother admitted she had not sought medical attention for); *Orlik v. Dutchess County*, 603 F.Supp.2d 632 (S.D.N.Y. 2009)(report prompted by medical personnel's personal observation of mother's preoccupation with drugs and inability to care for newborn).

In those few cases where an abuse investigation was conducted without a reasonable cause to suspect abuse, a violation of the parents' substantive due process rights was found. *Doe v. Heck*, 327 F.3d. at 524("because the defendants had no evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their children, or that they were complicit in any such abuse, the defendants violated the plaintiffs' right to familial relations by conducting a custodial interview of John Doe Jr. without notifying or obtaining the consent of his parents and by targeting the plaintiff parents as child abusers"); *Croft v. Westmoreland County Children Youth Services*, 103 F.3d 1123 (3d Cir. 1997)(caseworker not entitled to rely on the unknown credibility of an anonymous informant unless she could corroborate the information through other sources which would have reduced the chance that the informant was recklessly relating incorrect information or had purposely distorted information.) In this case, Defendants not only

failed to corroborate Hogle's hearsay account of her anonymous informant, they ignored every opportunity to do so.[21]

Moreover, the Plaintiffs in this case do not merely assert that the 41 minute interruption of custody was an arbitrary and shocking abuse of power but that also the very questioning itself - of a five year old girl in the presence of an adult male about her private areas and intimate home life - without any attempts whatsoever to corroborate Falletta's statements was also arbitrary and shocking, especially in light of the fact that the only information revealed from Hogle's personal knowledge was that T.C.P had made no statements nor shown any signs of abuse.

The County Defendant's wrongly claim that "Plaintiffs claim that the County committed a constitutional violation by subjecting them to an investigation at all." (County Def.'s MOL at p. 13). There is absolutely no citation to the Third Amended Complaint for this alleged "claim" by Plaintiffs. There are no claims whatsoever by the Plaintiffs for Scali-Decker talking to Hogle. Nor are there any claims for Scali-Decker's conversation with Falletta or the school nurse. None of those aspects of the investigation invaded "the private realm of family life which the state cannot enter." *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944).

The interview with T.C.P., the interview of Plaintiffs and observation of their child and the home visit did invade that constitutionally protected zone for which the Defendants had no reasonable justification and it is for those actions by the Defendants that Plaintiffs claim their substantive due process rights were violated.(T.A.C.at pps. 48-50).

---

[21]  Anonymous tips alone, even when made by the tipster themselves, are lacking in the necessary of indicia of reliability to create a "reasonable suspicion" to support a Terry stop. Anonymous tips need independent corroborating evidence to be sufficiently reliable. *Alabama v. White,* 496 U.S. 325 (1990). Here the "tipster" was not only anonymous but came by way of hearsay through Hogle, even further reducing the indicia of reliability.

The Defendants' cite to no authority for the proposition that all actions taken by state actors are constitutional because they mistakenly believe they have reasonable cause to suspect abuse. *Doe v. Heck* and *Croft* say just the opposite. The County Defendants' argument that their actions were *per se* reasonable under a substantive due process analysis because there was a state statute that required investigation is also baseless. State statutes do not create the bounds of constitutional behavior, the U.S. Constitution, as interpreted by this Court, does that.

Moreover, the state statute the County Defendants cite to, Social Services Law section 424(6)[22] was enacted in conjunction with Social Services Law section 413 and 414 which requires reports of abuse only be taken when there is reasonable cause to suspect abuse. This was the state's attempt to confine investigations to the constitutional parameters that there be "reasonable justification" before exercising the state's interest in protecting children.[23] It is for this very reason, that the Defendants lacked reasonable cause to suspect abuse, that Plaintiffs rest their substantive due process claims.

Defendants may not have realized that before charging the schoolhouse gates, but that was a result of the inadequate training the County and Village provided to its employees as well as School District and Village policies to participate and cooperate in these investigations without question. Mistakes don't make their conduct constitutional and Defendants have cited to

---

[22] There is nothing in Social Services Law § 424(6) that requires the investigation to include interviews of children as the first step with police present, without parental consent, without a court order, without exigent circumstances and without any independent investigation. Caseworkers have 60 days to complete an investigation. 18 N.Y.C.R.R. § 432.2

[23] If this Court determines as a matter of law that the report received in this case amounted to "reasonable cause to suspect" T.C.P. was abused – which Plaintiffs strongly argue it did not - Plaintiffs will challenge that statutory threshold as not meeting the constitutional standard of "reasonable justification" before a state may commence an investigation.

no authority otherwise. Plaintiffs have plead a plausible claim for violations of their substantive due process rights under the Fourteenth Amendment.

**IV.**

**PLAINTIFFS HAVE ALLEGED PLAUSIBLE CLAIMS FOR VIOLATION OF THEIR FOURTH AMENDMENT RIGHTS**

Plaintiffs' First through Fourth Causes of Action are all for violations of the Plaintiffs' Fourth Amendment Rights. The First Cause of Action is by T.C.P. against all the Defendants for seizure based on the in-school interview. The Second Cause of Action is for a search by all the Plaintiffs against all the Defendants based on the in-school interview. The Third Cause of Action is by Phillips and Condoluci against the County Defendants and Village Defendants for a search based on the interviews of them wherein their two year old daughter was observed. The Fourth Cause of Action is by Phillips and Condoluci against the County Defendants based on the home visit.

### A. The Unreasonable In School Seizure

The threshold consideration in a Fourth Amendment inquiry is whether the government conduct in question constitutes a search or seizure within the Fourth Amendment. *Kyllo v. United States*, 533 U.S. 27, 31 (2001). A seizure occurs where, "in view all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Kia P. v. McIntyre*, 235 F.3d 749, 752 (2d Cir. 2000).

The County Defendants argue that plaintiffs have failed to allege a seizure because there are no allegations of "threats, harsh tone, retention of personal effects, physical touching or any other indicia of coercion." (County Mol at p. 17). Quite simply, it is ludicrous as a matter of fact to assert that T.C.P. felt free to leave the Assistant Principal's Office - a five year old child escorted by an adult from her kindergarten class to the Assistant Principal's Office where three

adults are waiting to question her, the door was shut behind her, she was told she had answer their questions, that it was like a test and never told she was free to leave.

In the words of Justice Kagan during oral argument in the case of *J.D.B. v. North Carolina*, 131 S.Ct. 2394 (2011), where the Supreme Court held a suspect's age must be considered in determining whether *Miranda* rights were implicated, "[do we need either imaginative powers or empirical data to know that when a 13 year-old is brought into a room in his school, taken out of class, four people are there, two are police officers, one is assistant principal, threatened with custody, that that person is not going to feel free to take off and leave?"

J.D.B was thirteen years old. T.C.P. was five. Contrary to the Defendants' arguments, "children cannot be viewed simply as miniature adults." *J.D.B*, 131 S.Ct at 2404.

Next the County Defendants argue, *citing Williams v. Jurow*, 2007 WL 5463418, at \*15 (S.D.N.Y. June 29, 2007) and *Puricelli v. Houston*, 2000 WL 760522 (E.D. Pa., June 12, 200), that there is "caselaw to the effect" that is no violation based on an interview of a child in school unless there is a removal from custody. *Doe v. Heck*[24] and *Camreta v. Greene* say otherwise as did even Justice Scalia ""[r]ight. Take her into a room. I see that." (Condoluci Decl., Exhibit "B" at p. 35.)

---

[24] Defendants seek to distinguish *Doe v. Heck* on the seizure issue because it was a private school where parents have a greater expectation of privacy. Four years after *Heck*, in *United States v. Hollingsworth*, 495 F.3d 795, 802 (7th Cir. 2007) the Seventh Circuit revisited the issue when faced with a Fourth Amendment challenge to evidence obtained through an interview of a child at *a public school* by school authorities. In finding the evidence admissible, the Court noted the difference between that case and *Doe v. Heck*: "When a parent sends her child to school, she delegates some of her parenting responsibilities to school officials. Though she does not consent to overzealous investigators interrogating her child over the principal's objection (as occurred in *Doe*), she should reasonably expect that school officials will speak with her child if the child raises serious concerns about her home life." The Court made no distinction based on the private school status.

Moreover, our own Circuit in *Kia P. v. McIntyre*, 235 F.3d 749 (2d Cir. 2000) held that the retention of a child in a hospital at the request of caseworkers but after the child had been medically cleared was a seizure as well: "[t]he seizure in this case is unusual because the Hospital had physical custody of Mora both before and after the seizure. It occurred when the perceived danger of harm to Mora from her medical condition ended. Custody then passed from the Hospital as private actor to the Hospital as state actor, as it continued to hold her…").

While the public school in this case was a state actor when Plaintiffs voluntarily and temporarily relinquished custody, they did so only for the very limited purpose of allowing the school to provide T.C.P. with an education and related control necessary to maintain discipline and order within the school - the interview of T.C.P. served no such purpose. The moment the school sought to use the Plaintiffs' limited grant of custody for a purpose other than to educate her or maintain order, the seizure occurred. To hold otherwise would turn the child into nothing more than "a creature of the state" for the state to do with as it deems fit, regardless of the parents' will. This is in flat contradiction to the teachings of the Supreme Court.[25] Just as students do not "shed their constitutional rights … at the schoolhouse gate", *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969), neither do their parents. T.C.P. has stated a plausible claim for seizure.

Next the inquiry turns to whether the seizure was "unreasonable". *Tenenbaum* settles that question squarely: "If information possessed by [the defendants] warranted a person of reasonable caution in the belief that [the child] was subject to the danger of abuse if not removed from school before court authorization reasonably could be obtained,[the child's] removal

---

[25] "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince,* 321 U.S. at166.

complied with Fourth Amendment requirements despite the absence of a warrant equivalent because probable cause, reasonable cause, and exigent circumstances sufficient to justify it existed. A jury could reasonably conclude that the case here was otherwise." *Tenenbaum*, 193 F.3d at 605.

Defendants had more than sufficient time to obtain a court order before seizing T.C.P. at her school. They intentionally forewent that option so that the interview could be conducted without a court order. The seizure was unreasonable.

### B. The Unreasonable In School Search

"[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. U.S.*, 533 U.S. 27, 33 (2001).[26] "[P]rivate residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable." *U.S. v. Karo*, 468 U.S. 705, 715 (1984).

When a parent sends a child to school they naturally are aware that the child may discuss some innocuous matters of their home life with teachers or school personnel. They do not expect, however, that every intimate matter of their home life is fair game for the state to obtain through interrogation of their child. While school officials may indeed be mandated reporters when the ***child comes to them*** and discusses intimate home matters concerning abuse, parents do

---

[26] The Supreme Court definition of a search does not exclude violations of privacy expectations that occur as the result of questions, as the Village Defendants argue. The cases cited by the Village to support its argument that questions cannot be "searches" are wholly inapposite and deal with situations where adults were asked in a detainee setting limited questions concerning solely illegal conduct. *I.N.S. v. Delgado*, 466 U.S. 210 (1984)(officers executing probable cause warrant in factory asking each employee one to three questions about immigration status); *U.S. v. Hunter*, 2008 WL 2074076 (W.D.N.Y. May 14, 2008)(detainee asked during course of execution of drug related probable cause warrant whether he had "anything on him.") By contrast, the interview of T.C.P. occurred during the course of an illegal seizure where she was not free to leave and the questions asked invaded the penultimate private area – the home.

not expect that the school will intentionally set out to obtain such intimate details without any conduct or concerns that the child is abused. *Ferguson v. City of Charleston*, 532 U.S. 67, 78, at fn #13 (2001) ("[w]hile the existence of such laws might lead a patient to expect that members of the hospital staff might turn over evidence acquired in the course of treatment to which the patient had consented, they surely would not lean a patient to anticipate that hospital staff would intentionally set out to obtain incriminating evidence from their patients for law enforcement purposes."). The Plaintiffs have stated a plausible claim for a search.

The next inquiry, as with seizure, is whether the search was reasonable. As with the seizure analysis, the Defendants here had more than sufficient time to obtain a court order for the interview that took place here. The search was unreasonable. Plaintiffs have plead a plausible claim for an unreasonable search. [27]

### C. The Unreasonable Search of Plaintiffs – Parental Interview and Home Visit

The Defendants' main argument is that the interview with Condoluci and Phillips and home visit were not searches within the Fourth Amendment but that Plaintiffs consented to such searches.[28]

---

[27] The County Defendants argue that this search claim must be dismissed because a parent may not sue on his or her own behalf based on a search or seizure of the parent's child. (County Def's MOL at p. 18). However, "there may be circumstances in which a parent has Fourth Amendment standing to challenge the seizure of his minor child." *Tenenbaum*, 193 F.3d at 602, fn # 13. In *J.B. v. Washington County*, 127 F.3d 919, 928 (1997) the Tenth Circuit, noted that a defendant has standing with respect to searches of or seizures from various persons with whom "the defendant has a spousal, parental, or sibling relationship where a "common zone of privacy" was intruded upon." This is just such a case. (T.A.C. ¶ 386).

[28] The Village Defendants again claim that the questioning by Scolza of intimate home matters is not a "search". The matters questioned, however, went far beyond merely illegal conduct but into family matters such as whether Plaintiffs fought, used alcohol and their sleeping arrangements.

In order for consent to a search to be valid, it must be voluntary, "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *U.S. v Berkolayko*, 2009 WL 3030303, 08 CR 1327, at *3 (HB)(S.D.N.Y. Sept. 22, 2009)(internal citations omitted). The voluntariness of a consent to search is a question of fact to be determined from the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33 (1996). While "knowledge of the right to refuse consent is not a requirement of a finding of voluntariness ... it may be a factor in ascertaining whether the consent was coerced. *U.S. v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). Consent which is obtained through an illegal seizure or detention is tainted by the illegality and ineffective. *Florida v. Royer*, 460 U.S. 491 (1983). Moreover, the consenter's knowledge of law enforcement involvement "is critical to the existence of informed consent." *Ferguson v. City of Charleston*, 308 F.3d 380, 397 (4th Cir. 2002).

Plaintiffs here have alleged numerous facts that could rationally be found by a trier of fact to have amounted to coercion. (T.A.C. at ¶¶ 400, 401). They alleged that both the illegal search and seizure of T.C.P. that *preceded the demand for an interview and home visit* tainted the consent along with the Scali-Decker's refusal to provide the nature of the allegations made in the report until an interview and observation was consented to. *Id.* Plaintiffs also never consented to an interview by a police officer. (T.A.C. ¶ 400). Defendants' argument that these allegations fail *as a matter of law* is meritless.

## D.  There Is No "Special Needs" Exception

First and foremost, Plaintiffs find baseless the County and Village Defendants' argument that this Court – *on a motion to dismiss* – should create a new "special needs" exception that has heretofore been unrecognized by any Court in this country. Not only this, but that this newly

minted "special needs" exception, in contravention of Second Circuit authority, warrants dismissal of this suit at the very outset without any discovery whatsoever. Even were this Court to consider it, Second Circuit and Supreme Court precedent make clear that no "special needs" exception would be applicable in this case.

*Tenenbaum*, flatly held there was no "special needs" exception to traditional Fourth Amendment requirements even when in the context of solely an abuse investigation, not the kind of joint abuse/criminal investigation that took place here. [29] "If CWA caseworkers have "special needs", we do not think that freedom from ever having to obtain a predeprivation court order is among them. Caseworkers can effectively protect children without being excused from whenever practicable obtaining advance judicial approval of searches and seizures." *Tenenbaum*, 193 F.3d at 604 (internal citations omitted).

The public school "special needs" exception established by the Supreme Court in *New Jersey v. T.L.O.*, 469 U.S. 325 (1985) and *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646 *(1995)* is also clearly inapplicable in this case. "Public schools have a relationship with their students that markedly different from the relationship between most governmental agencies, including the CWA, and the children with whom they deal." *Tenenbaum*, 193 F.3d at 606. The mere fact that Defendants chose the Assistant Principal's office as the venue for their interrogation of T.C.P. does not bring it within the "special needs" recognized in *T.L.O.* and *Vernonia*. In those cases, the Supreme Court explicitly distinguished school officials conducting searches pursuant to their duties to maintain order and discipline, in which the lowered expectation is appropriate, from law enforcement searches and seizures outside of the academic context, in which it is not. The seizure and search of T.C.P. that occurred here was not

---

[29] The investigation in *Tenenbaum* involved sexual abuse of a five year old.

conducted to maintain order and discipline in the school. The only reason for conducting the interrogation at school was because that was the one place where Scali-Decker and Scolza could get to T.C.P. without a court order and without the parent's consent.

The multidisciplinary team statutes and protocol establish here that law enforcement involvement was not only pervasive but the immediate objective of the investigation. Scolza was present from the very outset of the investigation. (T.A.C. ¶ 22). In order for a "special needs" exception to apply "as a threshold matter, the search must serve as its immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation." *MacWade v. Kelly*, 460 F.3d 260, 268 (2d Cir. 2006). The investigation that took place here does not even meet the threshold test for a "special needs" exception.[30]

Defendants argue that the mere heinousness of the crime alone warrants a total suspension of all Fourth Amendment protection. Never has the Supreme Court, Second Circuit, or any circuit, sanctioned such a wholesale abandonment of constitutional rights based solely on the heinousness of the crime. "[T]he gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose." *City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000). These Defendants waited twenty-seven hours to interview T.C.P., more than enough time to get a court under.

Defendants also self-servingly claim that they were acting to "protect" children. This purported altruism rings hollow because "society's interest in the protection of children is …

---

[30] What Scolza may or may have not believed his purpose was is irrelevant. It is the programmatic purpose, not the individual officer's purpose, that determines whether a "special needs" exception is warranted. *See Ferguson v. City of Charleston*, 532 U.S at 79 (in rejecting a "special needs" exception "[t]he central and indispensable feature of the policy … was the use of law enforcement to coerce the patients into substance abuse treatment.); *City of Indianapolis v. Edmond*, 531 U.S. 32, 45046 (2000)("programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken … without individualized suspicion.)

composed not only with concerns about the safety and welfare of children from the community's point of view, but also with the child's well-being, autonomy, and relationship with the family."[31] *Tenenbaum*, 193 F.3d at 595.

In sum, even were this Court to consider the Defendants' "special needs" arguments at this juncture, it is clear that none would apply.

## V.

### PLAINTIFFS HAVE ALLEGED A PLAUSIBLE CLAIM AGAINST THE SCHOOL DISTRICT AND VILLAGE BASED ON POLICY, CUSTOM OR PRACTICE

In order to plead a *Monell* claim, a plaintiff need only allege (1) a constitutional injury; (2) resulting from a policy, custom or practice of the municipality. *Monell v. Dept' of Soc. Servs.*, 436 U.S. 658 (1978).

#### A. The School District Policy

While it is true that *Monell* held a policy or practice must be the "moving force" of the constitutional violation, it did not say that the unconstitutional policy had to be the *sole* moving force. This is exactly what the School District argument asks this Court to read into *Monell*.

Without the School District policy to allow these interviews on the mere presentation of identification, Scali-Decker and Scolza would have been turned away at the schoolhouse door and the unconstitutional injury avoided. The School District policy may not have been the sole force behind the injury, but it certainly was a "moving" one. Moreover, while the Third Amended Complaint alleges only one instance of unconstitutional activity, it alleges that one

---

[31] Defendants offer no explanation how the team protocol of having law enforcement present when the allegations of the report are first disclosed to parents does anything to "protect" children. It does not. Nor does the protocol of interviewing parents separately. The protocol is clearly designed to sandbag parents, in the presence of law enforcement (T.A.C ¶¶ 329, 330). By Scolza's own admission, the school interview was not conducted to "protect" her but because to do it otherwise would have made the investigation more difficult. (T.A.C. ¶ 244).

instance was undertaken pursuant to School District policy. (T.A.C. ¶¶140, 265-266). Under the School District's own legal citation, the Plaintiffs have plausibly alleged a *Monell* claim against the School District.

## B. The Village Policy

As to the Village Defendants' argument that they did not have a "policy" with respect to conducting child abuse investigations, the Village policy was with respect to conducting criminal investigations involving the crime of child abuse where a report had been received. Nowhere does *Monell* state that a plaintiff must allege a policy with respect to conducting "child abuse investigations" in order to state a claim.

The contract between the Village and County was for Scolza, as a police officer, to conduct criminal investigations because that's what his function was as the law enforcement member of the multidisciplinary team. When the Village contractually agreed to provide Scolza, as a police officer, to conduct these criminal investigations in accordance with the team protocol, it created Village policy with respect to conducting criminal investigations of child abuse. (T.A.C. ¶20-24, 118- 119, 319- 338).

The Village Defendants argue that it wasn't a "policy", it was only a "contract", as if mere labels end the inquiry. The Supreme Court never adopted such an overly formalistic view. In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) the Court held that for *Monell* purposes, a policy arose when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." That is exactly what the contract in this case did. Entering the contract was a deliberate choice made by the Village to follow a certain course of action with respect to conducting criminal investigations in crimes of child abuse when a report

had been received. The contract was signed by the Village mayor, an official with final policy making authority for the Village police under state law.(T.A.C. ¶¶ 320, 321).

Moreover, the Village cannot avoid liability simply by saying the contract required Scolza to follow County policy because by signing the contract, the Village made the deliberate choice to require Scolza to follow the County policy and multidisciplinary protocol. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)(authority to make municipal policy may be delegated with respect to specific subject matter subjecting delegating municipality to liability).

## VI.

### PLAINTIFFS HAVE ALLEGED A PLAUSIBLE CLAIM OF CONSPIRACY TO VIOLATE § 1983

Plaintiffs' Ninth Cause of Action is against the County, Village and School District for conspiracy to violate Plaintiffs' Fourth and Fourteenth Amendment rights. In order to state a claim for a § 1983 conspiracy, a plaintiff must sufficiently allege (1) an agreement between two or more state actors; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *Nieves v. New York City Police Dep't*, 2010 WL 330205 (S.D.N.Y. January 26, 2010). "Because of the secretive nature of conspiracies, plaintiff may assert circumstantial, rather than direct, evidence" to state a claim for conspiracy. *Lewis v. Krymkevich*, 2009 WL 4884093, * 12 (S.D.N.Y. Dec. 17, 2009).

Defendants argue Plaintiffs' allegations of conspiracy are too conclusory to state a plausible cause of action. What is conclusory about the factual allegation that the "County provided Village police officers with County business cards to conceal the fact that a criminal investigation was being concurrently conducted with the abuse investigation" or that "the multidisciplinary team protocol provided that the members were not to reveal to those being

investigated that police officers were concurrently a conducting criminal investigation…"
(T.A.C. ¶¶ 446-447).

Moreover, the allegations set forth in the Third Amended Complaint set forth that each of the Defendants knew of the other's policies because they were instructed to become familiar with them by their respective governing state agencies – the Department of Education for the School District and the New York State Office of Children and Family Services for the County and Village. (T.A.C. ¶¶ 442-444). The School District knew that in Orange County multidisciplinary teams consisting of police officer were conducting criminal investigations of the parents in conjunction with the abuse investigation and allowed the police officers into the school for the purpose of gathering evidence against students' parents. (T.A.C. 444).

All the Defendants have taken overt actions in furtherance of the conspiracy - the implementation of policies that work in conjunction with one another to effect warrantless, suspicionless seizures of children and the warrantless and suspicionless search of their parents. Of course, without the benefit of any discovery, plaintiffs cannot set forth a specific date, time and place when the defendants agreed to act in concert together to inflict the constitutional injury suffered by the Plaintiffs. Plaintiffs certainly have, however, set forth circumstantial facts from which such a meeting of the minds may be inferred. A *plausible* claim for conspiracy has been plead.

## VII.

## THERE IS NO SEPARATE FAILURE TO TRAIN CLAIM

The County Defendants seek to "dismiss" the Plaintiffs' claim for failure to train asserting that "although there is no separate cause of action, Plaintiffs make a claim for failure to train….at paragraphs 357 through 367." (County Def.'s MOL at p. 25). This is wrong. Plaintiffs make no separate claim for failure to train because "*Monell* does not provide a separate

cause of action for the failure ... to train its employees; it *extends* liability to a municipal organization where that organization's failure to train ... led to an independent constitutional violation." *Dayton v. The City of Middletown, Orange County, et. al.*, 2011 WL 2020240, 09-CV-8140 (KMK), at *9 (S.D.N.Y. March 31, 2011) (*quoting Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006)(emphasis in original). The failure to train claim is incorporated into Plaintiffs' *Monell* claims that the County and Village had a protocol and policy of investigating all reports the same way, regardless of whether the report created a reasonable cause to suspect abuse. (T.A.C ¶¶ 125, 184, 257)

Moreover, the Plaintiffs' failure to train allegations are not "boilerplate." The factual allegations demonstrate that every single County and Village employee, all identified by name, that viewed the report taken in this case mistakenly believed it was from a "mandated reporter" and also mistakenly believed that it created "reasonable cause" to suspect abuse. "Mandated reporter" and "reasonable cause" are definitions and statutory thresholds established by New York Social Services Law to meet constitutional "reasonableness" standards before conducting an investigation. The County and Village Defendants essentially argue that their employees should not have to know or understand the state law that governs their conduct. Clearly, these Defendants were aware that a failure to train their workers on these New York State laws – the very laws under which they operated - would result in constitutional injury and, in this case, did.[32]

---

[32] N.Y. Social Services regulations indeed require caseworkers receive training with respect to the Social Services Laws including legal issues. 18 N.Y.C.R.R. §432.2

# VIII.

## THE INDIVIDUAL DEFNDANTS ARE NOT ENTITLED
## TO DISMISSAL BASED ON QUALIFIED IMMUNTIY

Public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) if it was objectively reasonable for them to believe their acts did not violate those rights. *Southerland v. City of New York*, 2011 WL 2279186, * 8 (2d Cir., June 10, 2011). When applied properly, it works to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "[T]here is no need that the very action in question [have] previously been held unlawful" in order for a right to be clearly established. *Safford Unified School Dist. No. 1. v. Redding*, 129 S.Ct. 2633, 2643 (2009). As the Second Circuit recently stated in *Southerland v. City of New York*, 2011 WL 2279186, * 22 (2d Cir., June 10, 2011), in denying summary judgment to a caseworker on qualified immunity grounds, the "proper inquiry is whether the *right* itself—rather than its *source*—is clearly established." (emphasis in original).

"[A] defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir.2004). In addition, in such situations, "plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Holmes v. Poskanzer* 342 Fed.Appx. 651, 652 (2d Cir. 2009)(*quoting Benzman v. Whitman*, 523 F.3d 119, 125 (2d Cir.2008).

Where the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is not entitled to dismissal before the commencement of discovery. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Although the matter of whether a

right at issue is clearly established is a question of law, that question is "tied to the specific facts and context of the case." *Southerland, supra*, at \*20; *see also Walker v. Elliott*, 2010 WL 4916715, \*6 (M.D.Pa. October 25, 2010) ("[g]iven the highly fact-specific nature of certain qualified immunity inquiries, some qualified immunity claims may not be readily amenable to resolution at the outset of a case on a motion to dismiss.").

At the time the investigation took place, New York State Law clearly established that reports of abuse were to be taken and investigations were only to occur when there was reasonable cause to suspect that a child had been abused and these thresholds were to meet constitutional "reasonableness" requirements. N.Y. Social Services Law §§ 413, 414. At the time the investigation took place, Supreme Court precedent had established that anonymous tips alone, even when provided by the tipster themselves, were not sufficient to provide a reasonable suspicion sufficient to justify even brief detentions. *Alabama v. White*, 496 U.S. 325 (1990). In this case, the information from the "tipster" was not only anonymous, but came by way of hearsay making it even more unreliable than an anonymous tip. An objectively reasonable person, therefore, would have known that any investigation at all based on this report was unconstitutional. While these Defendants may not have realized there was no reasonable cause, that subjective belief does not make their actions objectively reasonable.

Adding to their knowledge, New York Family Court Act Section 1034 clearly established that before a Court could order access to a child there had to be "reasonable cause to suspect that a child or children's life or health may be in danger…" Administrative Directive 07-OCFS-ADM-07 from the New York State Office of Children and Family Services dated May 2, 2007, (annexed as Exhibit "C" to the Condoluci Decl.), states unequivocally that ***"parents … may refuse a CPS caseworker access to a named child…"*** and that when seeking a court order to

produce a child for questioning the CPS staff must have "***reasonable cause to suspect that a child or children's life or health may be in danger.***" (Condoluci Decl., Exhibit "C", p. 4 (emphasis in original))[33]. Moreover, the Defendants knew, and acknowledged that parents had that right to refuse access to their children for abuse investigations even when the child was at school. (T.A.C. ¶¶ 347-353). While the Defendants may not have realized the source of the parents' right was the Fourth or Fourteenth Amendment, they were certainly aware the right existed.

Finally, Plaintiffs take issue specifically with regard to Scolza, the police officer, who was conducting a criminal investigation of the parents and identified himself deceptively throughout the investigation process, including to the school (School District MOL at p. 15), as an "Investigator" for the County Social Services Department. The Village Defendants repeatedly seek to lump Scolza in with Scali-Decker and Jankowski. He is in a distinct law enforcement class.

Pursuant to the law, Scolza's role was as a police officer conducting a criminal investigation to generate evidence for general law enforcement purposes. Scolza claims that it was objectively reasonable for him to believe his conduct was lawful defies logic: the covert targeted criminal investigation of two individuals through an interrogation of a five year old child and search of their home - that he did not know was a search of their home – without consent, without a warrant, without probable cause, without exigent circumstances and without reasonable suspicion. While Scolza may not have subjectively realized he was a police officer conducting a criminal investigation, his subjective beliefs do make his beliefs objectively

---

[33] Administrative Directives are promulgated by the State Commissioner of Social Services pursuant to powers granted him by N.Y. Social Services Law Section 17. They create binding policies for local governmental units such as the County Department of Social Services.

reasonable. Even had Scolza reasonably believed he was an abuse "investigator", his actions in this case were not objectively reasonable for the same reasons that Jankowski and Scali-Decker's were not.

Totally absent from the Village Defendants MOL is any statement that Scolza did not use the evidence gathered during these investigations to aid in the criminal prosecution of parents. He most certainly did – he was required to under state law. (T.A.C. ¶ 23). A police officer conducting a criminal investigation that does not realize he is a police officer conducting a criminal investigation is not objectively reasonable but plainly incompetent.

In light of the above, and affording Plaintiffs all reasonable inferences from the facts that defeat the immunity defense, Scali-Decker, Jankowski and Scolza are not entitled to dismissal based on qualified immunity.

### Conclusion

For the foregoing reasons, the Defendants' motions to dismiss should be denied in their entirety.

Dated: Goshen, New York
September 23, 2011

/s/

_____

MARIE CONDOLUCI (MC-6108)

MARIE CONDOLUCI, PLLC
Attorney for the Plaintiffs
60 Erie Street, Suite 401
Goshen, New York 10924
Phone: (845) 591-5563

mcondoluci@optonline.net